# United States District Court
# for the Southern District of New York

---

JAMES GARLICK,

Petitioner,

v.

CHRISTOPHER MILLER,
SUPERINTENDENT OF GREAT MEADOW CORRECTIONAL FACILITY,

Respondent.

---

MEMORANDUM OF LAW IN SUPPORT OF
PETITION FOR A WRIT OF HABEAS CORPUS (28 U.S.C. § 2254)

---

Robert S. Dean (RD-0772)
Center for Appellate Litigation
120 Wall Street, 28th Floor
New York, New York 10005
(212) 577-2523, ext. 502

Katharine Skolnick (KS-1123)
*Of Counsel*
kskolnick@cfal.org, ext. 501

November 27, 2018

# TABLE OF CONTENTS

Preliminary Statement......................................................................1

Statement of Facts.........................................................................1

    A. The police identify Mr. Garlick as the lead suspect before
       Dr. Maloney performs her autopsy ............................................2

    B. Dr. Maloney's autopsy report declares that the cause of death
       was a homicidal stabbing............................................................3

    C. During interrogation, Mr. Garlick confirms that he did not intend
       to harm Sherwood and that Sherwood brandished a weapon during
       a struggle...................................................................................5

    D. Dr. Maloney certifies and signs the autopsy report more than
       a month after the indictment was issued....................................6

    E. The trial court overrules Mr. Garlick's Confrontation Clause
       objection. In turn, the prosecutor relies heavily on the autopsy
       report at trial...........................................................................8

    F. The Appellate Division holds that the autopsy report was not
       testimonial because it did not prove identity—that is, that
       Mr. Garlick committed the charged crime. .................................13

    G. The Court of Appeals and the United States Supreme Court
       deny further review...................................................................15

Reasons for Granting the Writ.........................................................15

    The Appellate Division's decision was "contrary to" and
    constituted an "unreasonable application of" clearly-established
    Supreme Court precedent............................................................15

    A. *Melendez-Diaz* clearly establishes that, contrary to the
       Appellate Division's determination, the Confrontation Clause
       is not limited to evidence proving identity..................................17

    B. The Appellate Division failed to apply the correct testimonial
       standard, thus violating the "contrary to" clause of § 2254(d)(1) .............19

    C. The autopsy report was materially indistinguishable from the
       reports in *Bullcoming* and *Melendez-Diaz*...................................24

    D. The Appellate Division unreasonably applied the primary-purpose
       standard. ..................................................................................27

    E. The constitutional violation was not harmless. .........................28

    F. Mr. Garlick exhausted this federal constitutional claim...........30

CONCLUSION................................................................................31

# TABLE OF AUTHORITIES

## Cases

*Bohan v. Kuhlmann*, 234 F. Supp.2d 231 (S.D.N.Y. 2002) ........................................ 16

*Brecht v. Abrahamson*, 507 U.S. 619 (1993) ................................................................ 28

*Bullcoming v. New Mexico*, 564 U.S. 647 (2011) ............................................... passim

*Cargle v. Mullin*, 317 F.3d 1196 (10th Cir. 2003) ....................................................... 16

*Clay v. United States*, 537 U.S. 522 (2003) .................................................................. 30

*Commonwealth v. Carr*, 986 N.E.2d 380 (Mass. 2013) .............................................. 28

*Crawford v. Washington*, 541 U.S. 36 (2004) ...................................................... passim

*Davis v. Washington*, 547 U.S. 813 (2006) .............................................. 18, 19, 22, 27

*Garlick v. New York*, 138 S.Ct. 502 (2017) ................................................................... 1

*Greene v. Fisher*, 565 U.S. 34 (2011) ........................................................................... 16

*Issa v. Bradshaw,* 904 F.3d 446 (6th Cir. 2018) .......................................................... 16

*King v. Turner*, 1 Mood. 347, 168 Eng. Rep. 1298 (1832) .......................................... 21

*Kirby v. United States*, 174 U.S. 47 (1899) .................................................................. 21

*Lafler v. Cooper*, 566 U.S. 156 (2012) .......................................................................... 16

*McCarley v. Kelly*, 801 F.3d 652 (6th Cir. 2015) ......................................................... 18

*Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009) ...................................... passim

*Michigan v. Bryant*, 562 U.S. 344 (2011) ................................................ 18, 19, 22, 27

*Miller v. State*, 313 P.3d 934 (Okla. Crim. App. 2013) .............................................. 28

*O'Sullivan v. Boerckel*, 526 U.S. 838 (1999) ............................................................... 30

*Ocamp v. Vail*, 649 F.3d 1098 (9th Cir. 2011) ............................................................ 29

*People v Acevedo*, 112 A.D.3d 454 (1st Dept. 2013) ................................................... 13

*People v. Freycinet*, 11 N.Y.3d 38 (2008) .......................................................... 13, 14, 19

*People v. Garlick*, 144 A.D.3d 605 (1st Dept. 2016) ............................................... 1

*People v. Garlick*, 29 N.Y.3d 948 (2017) .................................................................. 1

*People v. John*, 27 N.Y.3d 294 (2016) ............................................................... 13, 14

*People v. Lopez*, 72 A.D.3d 593 (1st Dept. 2010) .................................................. 29

*People v. Pealer*, 20 N.Y.3d 447 (2013) ................................................................. 14

*Rosario v. State*, 175 So.3d 843 (Fla. App. 2015) .................................................. 28

*State v. Kennedy*, 735 S.E.2d 905 (W. Va. 2012) ................................................... 28

*State v. Navarette*, 294 P.3d 435 (N.M. 2013) ....................................................... 28

*United States v. Ignasiak*, 667 F.3d 1217 (11th Cir. 2012) .................................... 28

*United States v. James*, 712 F.3d 79 (2d Cir. 2013) ..................................... 14, 22, 28

*Washington v. Griffin*, 876 F.3d 395 (2d Cir. 2017) .............................................. 22

*Williams v. Artuz*, 237 F.3d 147 (2d Cir. 2000) ..................................................... 30

*Williams v. Illinois*, 567 U.S. 50 (2012) .................................................... 14, 21, 22, 23

*Williams v. Taylor*, 529 U.S. 362 (2000) ...................................................... 16, 24, 27

*Wilson v. Sellers*, 138 S. Ct. 1188 (2018) ............................................................... 15

*Young v. Conway*, 698 F.3d 69 (2d Cir. 2012) ................................................... 16, 24

**Statutes**

28 U.S.C. § 2244 ......................................................................................................... 30

28 U.S.C. § 2254 .................................................................................................. passim

N.Y. C.P.L.R. § 4518 ............................................................................................... 7, 26

N.Y. C.P.L.R § 4520 ................................................................................................ 7, 26

N.Y. City Charter § 557 ...................................................................................... 7, 26, 28

iii

N.Y. County Law § 674 ................................................................................ 26

N.Y. County Law § 676 ................................................................................ 26

N.Y. County Law § 677 ..................................................................... 7, 26, 28

N.Y. Penal Law § 120.00 ............................................................................. 10

N.Y. Penal Law § 125.20 ............................................................................... 1

N.Y. Pub. Health Law § 4103 ........................................................... 7, 26, 28

U.S. Const. amend. VI ................................................................................. 17

## PRELIMINARY STATEMENT

James Garlick petitions this Court under 28 U.S.C. § 2254 to vacate his first-degree-manslaughter conviction.[1] Mr. Garlick is currently incarcerated at Great Meadow Correctional Facility under a judgment of conviction rendered November 1, 2013, sentencing him to 20 years in prison and five years of post-release supervision. The Appellate Division, First Department, affirmed the judgment on November 29, 2016.[2] The Court of Appeals denied leave to appeal on March 3, 2017.[3] In turn, the Supreme Court denied Mr. Garlick's petition for a writ of certiorari on December 4, 2017.[4]

Mr. Garlick now argues, as he did before the New York courts, that the State's introduction of a damaging autopsy report, without producing the medical examiner who prepared it, violated the Supreme Court's clearly-established Confrontation Clause precedents.

## STATEMENT OF FACTS

The State's trial theory was that Petitioner James Garlick caused the death of Gabriel Sherwood by stabbing him with a knife after Mr. Sherwood sexually harassed Mr. Garlick's girlfriend while she was walking in the Bronx. This section summarizes the trial evidence and the procedural history of Mr. Garlick's Sixth Amendment claim. Unless otherwise noted, all citations are to the trial record.

---

[1] N.Y. Penal Law § 125.20(1) (causing death with the intent to cause "serious physical injury").

[2] Petitioner's Appendix A882-84 ("A"); *People v. Garlick*, 144 A.D.3d 605 (1st Dept. 2016).

[3] A905; *People v. Garlick*, 29 N.Y.3d 948 (2017).

[4] A906; *Garlick v. New York*, 138 S.Ct. 502 (2017).

### A. The police identify Mr. Garlick as the lead suspect before Dr. Maloney performs her autopsy.

At 6:20 p.m. on November 1, 2011, the police responded to a report of an assault at an apartment building in the Bronx.[5] Inside the building's lobby, the police found Gabriel Sherwood lying on the ground bleeding.[6] The police secured the scene and an officer brought Sherwood to the hospital.[7] Within five minutes of his arrival, Sherwood was pronounced dead.[8]

That evening, the police launched a homicide investigation.[9] They began by reviewing the building lobby's surveillance video.[10] The video indicated that a male struggled with the victim on the ground inside the lobby.[11] Then, a female forcefully struck the victim in the skull over a dozen times.[12] The two assailants then fled.[13]

Around midnight, the investigation's lead detective (Detective DeGrazia) concluded that Johanna Rivera was the female who had repeatedly struck Sherwood in the head, prompting him to arrest Rivera.[14] During an interrogation, Rivera informed

---

[5] A348-49, A361.

[6] A349-50.

[7] A349-50.

[8] A352.

[9] A377-79.

[10] A378; Video: Trial Exhibit 5. This exhibit will be supplied to the Court.

[11] Trial Ex. 5.

[12] Trial Ex. 5.

[13] Trial Ex. 5.

[14] Suppression Hearing: A30-33, A51; Trial: A380.

the detective that Mr. Garlick was the male assailant depicted in the surveillance video.[15]

The next morning (November 2, 2011), the District Attorney's Office authorized the police to charge Rivera with intentional murder under the theory that her blows to Sherwood's head caused his death.[16] The lead detective then notified the New York City Police Department that Mr. Garlick was the male suspect from the video by issuing a department-wide notification at 4:45 a.m. to arrest him.[17]

## B. Dr. Maloney's autopsy report declares that the cause of death was a homicidal stabbing.

On the day of the homicide, staff at the New York City Office of Chief Medical Examiner ("OCME")—the agency charged with determining the cause of death in homicide cases—discussed this case with Bronx police (including the lead detective [DeGrazia]).[18] In turn, OCME staff prepared a "Supplemental Case Information" Sheet, which indicated that Sherwood was found with "multiple (4) stab wounds" in the lobby of the apartment building.[19] The Sheet added that a "call was placed to the 52nd PCT Detective Squad . . . and conversation was had with Detective Tommy Degrasio [sic] who is assigned to the case."[20]

---

[15] Suppression Hearing: A51-52.

[16] Suppression Hearing: A44.

[17] Suppression Hearing: A29, A50-52.

[18] A925.

[19] A925.

[20] A925.

On the following morning, Dr. Katherine Maloney of the New York City Office of Chief Medical Examiner ("OCME") performed an autopsy of the victim.[21]  Dr. James Gill, another pathologist, was present at the autopsy, as were two homicide detectives.[22] Before the autopsy, OCME staff conversed with lead detective DeGrazia and prepared a "Notice of Death" form, stating: "Circumstances of death: App. Manner: Homicide."[23]

Later that day, Dr. Maloney drafted an autopsy report in which she declared that the cause of death was a stabbing—not Rivera's blows to the head.[24] That conclusion ruled out Rivera as the person who caused the death. Dr. Maloney then notified the police of her findings.[25] After receiving this information, the NYPD declined to pursue murder charges against Rivera and instead charged Mr. Garlick with murder because the autopsy "made it clear" that the "stab wounds . . . caused the death."[26]

---

[21] Autopsy Report (Pros. Ex. 1): A907-927 ("Autopsy Report")

[22] A435; Autopsy Report: A919.

[23] Autopsy Report: A926.

[24] Autopsy Report: A909-14, A918

[25] A468-69.

[26] A469, A488. Rivera was ultimately indicted for first-degree assault and pled guilty to second-degree assault. A2-3, A267, A468.

### C. During interrogation, Mr. Garlick confirms that he did not intend to harm Sherwood and that Sherwood brandished a weapon during a struggle.

About a week later, the police arrested Mr. Garlick for murder. During an interrogation, Mr. Garlick stated that he had arrived at the scene because his girlfriend had frantically told him by phone that Sherwood was sexually harassing and threatening her.[27] When he arrived at the scene, he got into a fist fight with Sherwood outside the apartment building, which then spilled into the building's lobby.[28] During the fight, Mr. Garlick explained, Sherwood brandished a weapon and the two struggled for it.[29] Mr. Garlick stated that he never possessed a knife.[30] He finally declared: "All I was trying to do was defend myself and my girlfriend. It was a tragedy. This wasn't supposed to happen and I'm sorry for my part in this. I wasn't trying to hurt anybody."[31]

Less than two weeks later, on November 17, 2011, the State indicted Mr. Garlick for intentional murder, first-degree manslaughter (causing death while intending to cause serious physical injury), and assault with a dangerous weapon (first and second degree).[32]

---

[27] A387-92; Autopsy Report: A909-10.

[28] A387-92.

[29] A387, A391.

[30] A387, A391.

[31] A391.

[32] Indictment: A1-3.

### D. Dr. Maloney certifies and signs the autopsy report more than a month after the indictment was issued.

On December 29, 2011, more than a month after Mr. Garlick was indicted, Dr. Maloney completed and signed the final version of her autopsy report.[33] On the report, Dr. Maloney indicated a "DRAFT" date of "11/2/2011" and a "FINAL" date of "12/29/2011."[34]

At the beginning of her comprehensive report, Dr. Maloney "certif[ied]" that she performed the autopsy.[35] She asserted that the "manner of death" was "homicide" and that a "stab wound of [the] torso with perforation of heart" "cause[d] the death."[36] Dr. Maloney added that the "depth of penetration" of the purportedly fatal wound to the left chest was "4-1/2 to 5-1/2" inches.[37] This fatal wound "perforat[ed] [the] heart," collapsed the lung ("the lung is atelectatic"), and led to the loss of 1.5 liters of blood.[38]

Dr. Maloney further concluded that the victim had "blunt impact injuries of [the] head," numerous "abrasions" of the head and face, and "contusions of the face."[39] She asserted, however, that her "internal examination" of the head indicated no "scalp

---

[33] Autopsy Report: A914.

[34] A914.

[35] A910 ("I hereby certify that I, Katherine Maloney, M.D., City Medical Examiner - I have performed an autopsy on the body of Gabriel Sherwood, on the 2nd of November 2011, commencing at 9:00AM in the Bronx Mortuary of the Office of Chief Medical Examiner of the City of New York.").

[36] A907-A914, A918.

[37] A911; *see also* A229-30.

[38] A911; *see also* A230.

[39] A909, A912.

contusions" or skull "fracture[s]."[40] Dr. Maloney further concluded that there was "no epidural, subdural or subarachnoid hemorrhage. The brain has no contusions."[41]

OCME then certified the autopsy report as a business record under New York's statutory business-record rule and "affixed the official seal of the office of the Chief Medical Examiner of the City of New York" to the report.[42]

As state and local laws expressly mandate, OCME delivered the inculpatory report to the District Attorney's Office the very day Dr. Maloney signed it.[43] Under New York law, an autopsy report is admissible as prima facie evidence of the cause of death.[44]

---

[40] A912.

[41] A912.

[42] A908; N.Y. C.P.L.R. § 4518(a),(c) (business records are admissible hearsay).

[43] A907; N.Y. County Law § 677(4) ("The . . . medical examiner shall promptly deliver to the district attorney copies of all records pertaining to any death whenever, in his opinion, or in the judgment of the person performing the autopsy, there is any indication that a crime was committed."); *see also* N.Y. City Charter § 557(g).

[44] N.Y. C.P.L.R § 4520 ("Where a public officer is required or authorized, by special provision of law, to make a certificate or an affidavit to a fact ascertained, or an act performed, by him in the course of his official duty, and to file or deposit it in a public office of the state, the certificate or affidavit so filed or deposited is prima facie evidence of the facts stated."); N.Y. Pub. Health Law § 4103(3) ("A certified copy of the record of a birth or death, a certification of birth or death, a transcript of a birth or death certificate, a certificate of birth data or a certificate of registration of birth, when properly certified by the commissioner or persons authorized to act for him, shall be prima facie evidence in all courts and places of the facts therein stated.").

**E. The trial court overrules Mr. Garlick's Confrontation Clause objection. In turn, the prosecutor relies heavily on the autopsy report at trial.**

At trial, the State proffered Dr. Maloney's autopsy report as its first exhibit. The State, however, refused to produce Dr. Maloney or Dr. Gill (the other medical examiner who was present during the autopsy) for live testimony subject to cross-examination. Instead, as its first witness, the State proffered Dr. Susan Ely, who had no involvement in the autopsy.[45]

The State never claimed that Dr. Maloney or Dr. Gill was unavailable. Instead, they had simply changed offices; Dr. Maloney was working in upstate New York, while Dr. Gill was working about an hour away in Stamford, Connecticut.[46] Nothing in the record suggests either witness could not have traveled to New York City for the trial.

Mr. Garlick's counsel objected to the report's admission on Confrontation Clause grounds. He argued that the autopsy report was "testimonial" under *Crawford v. Washington*[47] and its progeny because it was a certified document and an "'objective witness [would] reasonably . . . believe that the . . . report would be available for use

---

[45] A97-98, A173.

[46] A173, A238-39.

[47] 541 U.S. 36 (2004).

8

later at trial.[ ]"[48] The trial court overruled Mr. Garlick's objection, holding that the autopsy report was not testimonial under the Confrontation Clause.[49]

The State then called Dr. Ely as its first witness and introduced the autopsy report as Exhibit 1.[50] Parroting the report, Dr. Ely claimed that the "actual cause of death" was a "stab wound of torso with perforation of heart" and that head trauma did not cause the death.[51]

Dr. Ely contrasted "stab wounds" with "incised wounds."[52] She explained that a stab wound is a deep wound created by the tip of the knife entering the body, while an incised wound is created by the side of the knife laterally cutting the body.[53] To distinguish between these wounds, a forensic pathologist must assess "certain characteristics that . . . forensic pathologists . . . are trained to recognize."[54] Specifically, the pathologist searches for a "very skinny triangle of a wound" that can only be observed upon a "very careful[ ]" examination.[55]

---

[48] A173-79 (quoting *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 310-11 (2009)).

[49] A211-13.

[50] A224-25; A238-39.

[51] A229, A236-38.

[52] A227-28; Autopsy Report: A909-12 (finding that two of the wounds were "stab wounds" to the chest while five other wounds were "incised" wounds).

[53] A228-29; A243-45.

[54] A244.

[55] A244.

Defense counsel asked Dr. Ely if Dr. Maloney was certified in forensic pathology when she performed the autopsy. Dr. Ely answered, "I can't say for sure, I do not believe she was, but I'm not certain of that."[56]

The State also contended at trial that the surveillance video established cause of death and the requisite intent—that is, intent to kill (murder) or intent to cause serious physical injury (first-degree manslaughter). But, as the trial court found during the charge conference, "[t]he video itself presents a jury question whether a knife or sharp object is visible on the film."[57] Further, the video fails to foreclose the possibility that Mr. Garlick inadvertently hurt Mr. Sherwood with the knife during a struggle for it.[58] Finally, the video does not clearly indicate whether or not Rivera had an object in her hand when striking Sherwood in the head.[59]

At the close of the evidence, Mr. Garlick requested that the court instruct the jury to consider the lesser-included count of third-degree assault (intentionally causing physical injury).[60] Mr. Garlick pressed that "intent is an issue in this case, an issue that the People have to prove beyond a reasonable doubt, and it is a questionable jury question based on the evidence that was adduced at trial."[61] The State resisted such

---

[56] A246-47.

[57] A607.

[58] Pros. Ex. 5.

[59] Pros. Ex. 5.

[60] A572; N.Y. Penal Law § 120.00(1).

[61] A574.

an instruction, stressing that the autopsy report concluded that "[t]here are seven stab wounds here, . . . a stab to the heart, collapsed lung, one stab caused the victim to lose one and a half liters, one-third of the blood in his body. The stab designated A [in the autopsy report's body diagram], which is also a stab wound, pierced the diaphragm."[62]

Finding that a reasonable juror could conclude that Mr. Garlick's intent was merely to cause physical injury (thus rendering him not guilty of first-degree manslaughter and second-degree murder), the court agreed to submit a third-degree assault charge to the jury.[63]

In summation, the prosecution again relied heavily upon the autopsy report, pressing that Sherwood "had seven knife injuries and also some bruises which didn't contribute to death."[64] The prosecution added that the "most deadly" and "fatal wound" was the wound "designated" wound "C" on the autopsy report.[65] That wound, the prosecutor explained, "perforated the victim's heart. It went through his heart. There was significant bleeding in his chest cavity. That stab wound alone cost Gabriel Sherwood one and one-half liters of blood. One-third of the blood in his body was lost

---

[62] A586-87; Autopsy Report: A917 (diagram).

[63] A607-08.

[64] A644.

[65] A644; Autopsy Report: A917 (diagram).

by that one fatal stab. And that stab also caused him to suffer a collapsed lung. Another stab went through Mr. Sherwood's diaphragm."[66]

Also relying on the autopsy report, the prosecutor pressed that although Rivera was "pounding," "punching," and "kicking" Sherwood, "we know from the medical examiner none of that contributed in any way to death."[67] The prosecutor reminded the jury that the autopsy report caused the police to accuse Mr. Garlick of causing the death and to withdraw the homicide charges lodged against co-defendant Rivera.[68] "And remember," the prosecutor stated, "the stab that did the killing, the deepest wound went in a distance of up to five and one-half inches. Five and one-half inches into the body of the victim."[69]

After asking the judge during deliberations to "explain all three charges" again, the jury acquitted Mr. Garlick of intentional murder but convicted him of first-degree manslaughter.[70] Mr. Garlick was sentenced to 20-years in prison, followed by five years of post-release supervision.[71]

---

[66] A644-45.

[67] A646.

[68] A652.

[69] A658.

[70] A720, A734.

[71] A752.

**F. The Appellate Division holds that the autopsy report was not testimonial because it did not prove identity—that is, that Mr. Garlick committed the charged crime.**

On appeal to the Appellate Division, First Department, Mr. Garlick renewed his contention that under the Sixth Amendment, the autopsy report was testimonial and thus inadmissible through a surrogate witness.[72]

Relying on precedent from the New York Court of Appeals, the Appellate Division found no constitutional violation because the report did not prove identity:

> "Defendant's right of confrontation was not violated when an autopsy report prepared by a former medical examiner, who did not testify, was introduced through the testimony of another medical examiner" (quoting *People v Acevedo*, 112 A.D.3d 454, 455 (1st Dept. 2013)), since the report, which "did not link the commission of the crime to a particular person," was not testimonial (quoting *People v. John*, 27 N.Y.3d 294, 315 (2016)). Defendant's contention that *People v. Freycinet*, 11 N.Y.3d 38 (2008), has been undermined by subsequent decisions of the United States Supreme Court is unavailing (citing *Acevedo*, 112 A.D.3d at 455).[73]

---

[72] A802-18.

[73] A884.

13

In *Freycinet*, on which the Appellate Division relied, the New York Court of Appeals held that an autopsy report was not testimonial because it "did not directly link defendant to the crime. The report is concerned only with what happened to the victim, not who killed her."[74] The Court of Appeals subsequently ratified that analysis in *People v. Pealer*[75] and again in *People v. John*,[76] which the Appellate Division also cited.[77]

---

[74] 11 N.Y.3d at 42.

[75] 20 N.Y.3d 447, 454 (2013) ("In contrast, we [have] determined that a graphical DNA report that did not explicitly tie the accused to a crime was deemed to be nontestimonial since it shed no light on the guilt of the accused in the absence of an expert's opinion that the results genetically match a known sample. A similar conclusion applied to an autopsy report prepared by a civilian agency in that it was a contemporaneous, objective account of observable facts that did not link the commission of the crime to a particular person") (citing *Freycinet,* 11 N.Y.3d at 42; internal citations and quotation marks omitted).

[76] 27 N.Y.3d at 315 ("We are not retreating from our prior decisions holding that, given the primary purpose of a medical examiner in conducting autopsies, such redacted reports—'a contemporaneous, objective account of observable facts that [do] not link the commission of the crime to a particular person'—are not testimonial") (citing *Pealer*, 20 N.Y.3d at 454 and *Freycinet*, 11 N.Y.3d at 42).

The *John* court also cited *United States v. James*, 712 F.3d 79, 99 (2d Cir. 2013), for its "link-to-a-particular-person" standard. *John*, 27 N.Y.3d at 315. But in *James*, the Second Circuit rejected such a standard. *James*, 712 F.3d at 95 ("Nor do we think we can apply the [ ] narrowed definition of testimonial," proposed by the plurality decision in *Williams v. Illinois*, 567 U.S. 50 (2012), "which would require that the analyst had 'the primary purpose of accusing a targeted individual of engaging in criminal conduct[.]' Again, five Justices disagreed with this rationale, and it would appear to conflict directly with *Melendez-Diaz*, which rejected a related argument.") (citing *Williams*, 567 U.S. at 135 (Kagan, J., dissenting)). Instead, the Second Circuit in *James* simply held that the report was not testimonial because the report was not prepared as part of a homicide investigation and did not conclude that the cause of death was homicide. 712 F.3d at 99.

[77] A884.

## G. The Court of Appeals and the United States Supreme Court deny further review.

Mr. Garlick sought discretionary review of this Confrontation Clause claim before the New York Court of Appeals.[78] Without comment, the court denied leave to appeal.[79] Mr. Garlick then petitioned the Supreme Court for a writ of certiorari, which the Court denied on December 4, 2017.[80]

## REASONS FOR GRANTING THE WRIT

### The Appellate Division's decision was "contrary to" and constituted an "unreasonable application of" clearly-established Supreme Court precedent.

The writ of habeas corpus is a bulwark against unconstitutional convictions. Under 28 U.S.C. § 2254(d)(1), the habeas court must "train its attention on the particular reasons—both legal and factual—why state courts rejected a state prisoner's federal claims."[81] In turn, the court must issue the writ under two circumstances:

- the state court's determination was "contrary to" clearly-established Supreme Court precedent—that is, the state court applied the wrong legal standard or decided a "case differently than [the Supreme Court] on a set of materially indistinguishable facts"; or

---

[78] A885-904.

[79] A906.

[80] A906.

[81] *Wilson v. Sellers*, 138 S. Ct. 1188, 1191-92 (2018)

15

- the state court decision "involved an unreasonable application" of clearly established Supreme Court precedent.[82]

When the state court fails to apply the correct legal rule (thus violating the "contrary to" provision), a federal court reviews the constitutional claim *de novo*.[83] On the other hand, if the state court unreasonably applied the correct legal standard or violated "materially indistinguishable" precedent, the writ simply issues.[84]

*  *  *

In reviewing Mr. Garlick's argument that the Confrontation Clause barred the autopsy report's admission, the Appellate Division did not apply the correct constitutional standard, thus violating the "contrary to" clause of § 2254(d)(1).[85] Additionally, the Appellate Division's decision violated "materially indistinguishable" precedent— *Bullcoming v. New Mexico*[86] and *Melendez-Diaz v. Massachusetts*[87]—and unreasonably applied the Supreme Court's clearly-established testimonial standard. Thus, the writ should issue.

---

[82] 28 U.S.C. § 2254(d)(1); *Lafler v. Cooper*, 566 U.S. 156, 173 (2012); *Williams v. Taylor*, 529 U.S. 362, 405-13 (2000); *Young v. Conway*, 698 F.3d 69, 85 (2d Cir. 2012); *Cargle v. Mullin*, 317 F.3d 1196, 1202 (10th Cir. 2003); *Bohan v. Kuhlmann*, 234 F. Supp.2d 231, 278 (S.D.N.Y. 2002).

The relevant date for determining "clearly established" Supreme Court law is the date of the last state-court decision on the merits. *Greene v. Fisher*, 565 U.S. 34, 40 (2011). Here, that date is November 29, 2016, the date the Appellate Division rejected Mr. Garlick's confrontation claim on the merits. A882-84.

[83] *Williams*, 529 U.S. at 405-413; *see also Issa v. Bradshaw,* 904 F.3d 446, 453 (6th Cir. 2018).

[84] 28 U.S.C. § 2254(d)(1).

[85] *Williams*, 529 U.S. at 405-13.

[86] 564 U.S. 647 (2011).

[87] 557 U.S. 305 (2009).

16

### A. *Melendez-Diaz* clearly establishes that, contrary to the Appellate Division's determination, the Confrontation Clause is not limited to evidence proving identity.

The Confrontation Clause guarantees the accused the right to be "confronted with the witnesses against him."[88] Under the Clause, the State cannot introduce a testimonial out-of-court statement without producing the declarant for confrontation.[89]

It is irrelevant whether the trial court believes that an out-of-court statement appears "reliable."[90] As the Supreme Court held in *Crawford v. Washington*:

> To be sure, the Clause's ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination. . . . Dispensing with confrontation because testimony is obviously reliable is akin to dispensing with jury trial because a defendant is obviously guilty. This is not what the Sixth Amendment prescribes.[91]

Thus, post-*Crawford*, the Supreme Court has held that the confrontation right does not dissolve because (1) an out-of-court declaration appears to be an "objective"

---

[88] U.S. Const. amend. VI.

[89] *Crawford v. Washington*, 541 U.S. 36 (2004).

[90] *Bullcoming*, 564 U.S. at 661 ("[T]he 'obvious reliability' of a testimonial statement does not dispense with the Confrontation Clause . . . Accordingly, the analysts who write reports that the prosecution introduces must be made available for confrontation even if they possess 'the scientific acumen of Mme. Curie and the veracity of Mother Teresa.'") (quoting *Crawford*, 541 U.S. at 62, and *Melendez-Diaz*, 557 U.S. at 319 n. 6).

[91] *Crawford*, 541 U.S. at 61-62 (quoted in *Melendez-Diaz*, 557 U.S. at 317-18).

17

account of "contemporaneous" observations or (2) the declarant is "neutral."[92] Instead, clearly-established Supreme Court precedent holds that the Clause applies to *all* "testimonial" statements—that is, statements whose "primary purpose" was to "establish or prove past events potentially relevant to later criminal prosecution."[93]

In *Melendez-Diaz* and *Bullcoming*, the Court further held that there is no "forensic-evidence exception" to the Clause.[94] Instead, formalized forensic reports fall within the "core class of testimonial statements."[95] As *Bullcoming* held, "An analyst's

---

[92] *Bullcoming*, 564 U.S. at 659-60; *Melendez-Diaz*, 557 U.S. at 315-20.

[93] *Melendez-Diaz*, 557 U.S. at 310-11 (a forensic report was testimonial because it was "made under circumstances which would lead an objective witness reasonable to believe that the statement would be available for use at a later trial") (quoting *Crawford*, 541 U.S. at 51-52 (defining the "core class" of "testimonial statements" to include "statements that were made under circumstances which would lead an objective witness reasonable to believe that the statement would be available for use at a later trial")); *Melendez-Diaz*, 557 U.S. at 324; *Bullcoming*, 564 U.S. at 663-64 ("We turn, finally, to the State's contention that the . . . blood-alcohol analysis reports are nontestimonial in character, therefore no Confrontation Clause question even arises in this case. *Melendez-Diaz* left no room for that argument, the New Mexico Supreme Court concluded, *a conclusion we find inescapable*. In *Melendez-Diaz*, a state forensic laboratory, on police request, analyzed seized evidence (plastic bags) and reported the laboratory's analysis to the police (the substance found in the bags contained cocaine). [The certificates,] this Court held, were 'incontrovertibly affirmations made for the purpose of establishing or proving some fact' in a criminal proceeding. The same purpose was served by the certificate in question here.") (internal citations, brackets and ellipsis omitted; emphasis added); *Michigan v. Bryant*, 562 U.S. 344, 356 (2011) ("'Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.'") (quoting *Davis v. Washington*, 547 U.S. 813, 822 (2006)); *McCarley v. Kelly*, 801 F.3d 652, 664-65 (6th Cir. 2015) (the "primary purpose" standard constitutes clearly established Supreme Court law); *see also Melendez-Diaz*, 557 U.S. at 316-17 (the absence of an interrogation is irrelevant).

[94] *Bullcoming*, 564 U.S. at 658-59; *Melendez-Diaz*, 557 U.S. at 317-21.

[95] *Melendez-Diaz*, 557 U.S. at 310 (quoting *Crawford*, 541 U.S. at 51).

certification prepared in connection with a criminal investigation or prosecution . . . is 'testimonial,' and therefore within the compass of the Confrontation Clause."[96]

## B. The Appellate Division failed to apply the correct testimonial standard, thus violating the "contrary to" clause of § 2254(d)(1).

The Appellate Division failed to apply the Supreme Court's testimonial standard, thus requiring *de novo* review.

The Appellate Division did not consider whether the autopsy report's primary purpose was to "establish or prove past events potentially relevant to later criminal prosecution."[97] Instead, the Appellate Division held that the autopsy report was not testimonial "since [it] did not 'link the commission of the crime to a particular person.'"[98] This rule comes from a pre-*Melendez-Diaz* decision (*Freycinet*), where the New York Court of Appeals held that an autopsy report was not testimonial because it "did not directly link defendant to the crime. The report is concerned only with what happened to the victim, not who killed her."[99]

This radical rule, which limits a fundamental procedural right to a particular "element" of the crime—identity—finds no support in Supreme Court jurisprudence. The Court has never conditioned any of the procedural protections guaranteed by the

---

[96] *Bullcoming*, 564 U.S. at 658-59.

[97] *Bryant*, 562 U.S. at 357; *Melendez-Diaz*, 557 U.S. at 310 (quoting *Crawford*, 541 U.S. at 51-52); *Davis*, 547 U.S. at 822.

[98] A884 (citing *People v. Freycinet*, 11 N.Y.3d 38, 42 (2008)).

[99] *Freycinet*, 11 N.Y.3d at 42.

19

Bill of Rights on the nature of the particular element at issue. For instance, no Supreme Court decision suggests that the Sixth Amendment rights to counsel, compulsory process, or jury apply to certain "elements" but not others.

It is no surprise, therefore, that this "identity" limitation violates clearly-established Confrontation Clause precedent. In *Melendez-Diaz*, the Supreme Court devoted an entire subsection of its decision to squarely rejecting Massachusetts' effort to establish an identity-based limitation.[100] There, Massachusetts argued that narcotics analysts who create reports establishing a critical (but non-identity) element—the nature and weight of a substance—are immune from confrontation because they are not "'accusatory' witnesses, in that they do not directly accuse [others] of wrongdoing; rather their testimony is inculpatory only when taken together with other evidence linking petitioner to the contraband."[101]

The Court held that limiting the Clause to identity evidence "finds no support in the text of the Sixth Amendment or in our case law."[102] Instead, *all* testimonial statements are subject to confrontation because the Sixth Amendment does not establish a "category of witnesses [who are] helpful to the prosecution [ ] but somehow immune from confrontation."[103]

---

[100] 557 U.S. at 313-314 (Section III.A.).

[101] 557 U.S. at 313.

[102] 557 U.S. at 313.

[103] 557 U.S. at 313-314.

*Melendez-Diaz* further confirmed that an identity limitation "would be contrary to longstanding case law" going back to the nineteenth century, which had established that the Confrontation Clause applies to non-identity evidence.[104] Indeed, the vast majority of forensic reports generated in criminal cases have nothing to do with identity; they instead, as in *Bullcoming* and *Melendez-Diaz*, bear on the nature of a substance, a substance's weight, or blood content. Nevertheless, the Supreme Court has "refused to create a 'forensic evidence' exception" to the Sixth Amendment.[105]

The *Williams* plurality decision does not somehow override the clearly-established law set forth in *Melendez-Diaz*. Although the *Williams* plurality (four Justices) suggested that the Clause applies only when a statement "accus[es] a targeted individual of engaging in criminal conduct,"[106] *Melendez-Diaz* rejected an "identity" limitation,

---

[104] 557 U.S. at 314 (explaining that in *Kirby v. United States*, 174 U.S. 47 (1899), the Court held that although records proved "only that the property was stolen, and not that [defendant] received it . . . admission of the records violated [defendant's] rights under the Confrontation Clause"); *id.* at 314 (citing *King v. Turner*, 1 Mood. 347, 168 Eng. Rep. 1298 (1832) (confession by one defendant to having stolen certain goods could not be used as evidence against another defendant accused of receiving the stolen property)).

[105] *Bullcoming*, 564 U.S. at 658-59.

[106] 567 U.S. at 83-84 (plurality op., Alito, J.).

as did five members of the Supreme Court in *Williams* itself.[107] As Justice Kagan's

opinion in *Williams* explained:

> Where [the "targeted individual"] test comes from is any-
> one's guess. Justice Thomas rightly shows that it derives
> neither from the text nor from the history of the Confron-
> tation Clause.[108] And it has no basis in our precedents. We
> have previously asked whether a statement was made for
> the primary purpose of establishing "past events poten-
> tially relevant to later criminal prosecution"—in other
> words, for the purpose of providing evidence (citing *Davis*,
> 547 U.S. at 822, *Bullcoming*, 131 S.Ct. at 2716-2717, *Bry-
> ant*, 131 S.Ct. at 1157, 1165, *Melendez-Diaz*, 557 U.S. at
> 310-311, and *Crawford*, 541 U.S. at 51-52). None of our
> cases has ever suggested that, in addition, the statement
> must be meant to accuse a previously identified individual;
> indeed, in *Melendez-Diaz*, we rejected a related argument
> that laboratory "analysts are not subject to confrontation
> because they are not 'accusatory' witnesses."[109]

As Justice Kagan's opinion correctly shows, the plurality's proposed "targeted in-

dividual" standard (which did not garner majority support) violates the Supreme

Court's clearly-established precedents.

---

[107] *Washington v. Griffin*, 876 F.3d 395, 407 n.10 (2d Cir. 2017) (holding that the New York Appel-
late Division erred in holding that a statement is not testimonial if "standing alone [it] shed[s] no light
on the issue of the defendant's guilt"); *United States v. James*, 712 F.3d 79, 95 (2d Cir. 2013) ("Nor do
we think we can apply the plurality's narrowed definition of testimonial, which would require that the
analyst had 'the primary purpose of accusing a targeted individual of engaging in criminal conduct[.]'
Again, five Justices disagreed with this rationale, and it would appear to conflict directly with *Melen-
dez–Diaz*, which rejected a related argument.") (citing *Williams*, 567 U.S. at 135 (Kagan, J., dissent-
ing)).

[108] Citing 557 U.S. at 114-15 (Thomas, J., concurring).

[109] *Williams*, 567 U.S. at 135 (Kagan, J., dissenting) (quoting *Melendez-Diaz*, 557 U.S. at 313).

At any rate, Justice Alito, writing for the *Williams* plurality, was not even advancing the radical theory that the Clause is limited to evidence proving "identity." Instead, the plurality's standard focuses on the timing of the report—that is, whether the State has already isolated a suspect—not the element it establishes. Thus, the plurality stated, the DNA report at issue did not have the primary purpose of accusing a targeted individual because it was intended to catch an unknown "rapist who was still at large. . . . At the time of the testing, petitioner had not yet been identified as a suspect."[110] As the plurality was simply holding that the report must target a "known" suspect (not that the report must prove "identity"), the plurality confirmed that its standard was *consistent* with *Melendez-Diaz* and *Bullcoming*, where the reports, although not proving identity, nevertheless constituted evidence against a known suspect.[111]

Under this correct reading of the *Williams* plurality's proposal, the report here absolutely accused a targeted individual of homicide. At the time Dr. Maloney drafted

---

[110] *Williams*, 567 U.S. at 84-86 (Alito, J.).

[111] *Williams*, 567 U.S. at 82-83 (plurality opinion) (citing *Bullcoming*, *Melendez-Diaz* and *Crawford* for the proposition that in "post-*Crawford* cases in which a Confrontation Clause violation has been found," the statement "accus[ed] a targeted individual"); *Williams*, 567 U.S. at 84 (the DNA report at issue in *Williams* was not intended to accuse a targeted individual because "its primary purpose was to catch a dangerous rapist who was still at large, not to obtain evidence for use against petitioner").

the report, the police had already isolated Mr. Garlick as the prime homicide sus-pect.[112] And at the time she signed and certified it, Mr. Garlick had already been indicted for murder.[113] Thus, even under the *Williams* plurality's narrowed view of the Clause, the certified report here was testimonial.

As the state court identified the "wrong legal standard"—an "identity" rule—the decision was "contrary to" clearly established Supreme Court precedent, thus requir-ing *de novo* review.[114] And, as shown in Parts C and D, *infra*, the report here was unquestionably testimonial, thus precluding its admission absent confrontation.

### C. The autopsy report was materially indistinguishable from the reports in *Bullcoming* and *Melendez-Diaz*.

The Appellate Division decision was not merely "contrary to" settled Supreme Court law because it applied the wrong constitutional standard; it was also contrary to clearly-established Supreme Court precedent because the facts of *Melendez-Diaz* and *Bullcoming* are "materially indistinguishable" from the facts here.[115]

In *Melendez-Diaz* the Court held that a forensic report declaring that a substance was an illegal drug fell within the "core class of testimonial statements" because it was written "'under circumstances which would lead an objective witness reasonably

---

[112] Suppression Hearing: A50-52 (hours after the incident, and prior to the autopsy, Rivera had identified Mr. Garlick as the person in the surveillance footage and the police issued a department-wide notification to arrest him).

[113] Indictment: A1-3 (filed on November 28, 2011); Autopsy Report: A914 (finalized and certified a month later on December 29, 2011).

[114] *E.g.*, *Young*, 698 F.3d at 84-85.

[115] *Williams*, 529 U.S. at 413.

to believe that the statement would be available for use at a later trial.'"[116] The report there was transmitted directly to law enforcement personnel and contained "the precise testimony [the witness] would be expected to provide if called at trial."[117]

*Bullcoming* reaffirmed that "[a]n analyst's certification prepared in connection with a criminal investigation or prosecution . . . is 'testimonial' and therefore within the compass of the Confrontation Clause."[118] Because New Mexico law required the laboratory to assist the police investigation, there was no doubt the blood alcohol report at issue was "'made for the purpose of establishing or proving some fact' in a criminal proceeding."[119]

*Melendez-Diaz* and *Bullcoming* dictate that, as here, when a medical examiner creates an autopsy report during an active homicide investigation and asserts that the cause of death is homicide, the report falls within the "core class of testimonial statements."[120] Such reports are created "'under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.'"[121] As in those cases, medical examiners know that, under such circumstances, their report will serve as crucial evidence in a criminal case. That is particularly true when, as here: (1) investigating police officers are present during

---

[116] *Melendez-Diaz*, 557 U.S. at 310-11 (quoting *Crawford*, 541 U.S. at 52).
[117] *Melendez-Diaz*, 557 U.S. at 310-11.
[118] *Bullcoming*, 564 U.S. at 658-59 (citing *Melendez-Diaz*, 557 U.S. at 319-24).
[119] *Bullcoming*, 564 U.S. at 664-65 (quoting *Melendez-Diaz*, 557 U.S. at 310).
[120] *Melendez-Diaz*, 557 U.S. at 310-11.
[121] *Melendez-Diaz*, 557 U.S. at 310-11 (quoting *Crawford*, 541 U.S. at 51-52).

the autopsy; (2) state law mandates, as in *Bullcoming* and *Melendez-Diaz*, that the analyst "assist in [state criminal] investigations" by immediately forwarding the autopsy report to prosecuting authorities; and (3) state law renders the report, as in *Bullcoming* and *Melendez-Diaz*, "prima facie evidence" of the facts asserted therein.[122]

Furthermore, as in *Bullcoming* and *Melendez-Diaz*, "the formalities attending" the autopsy report are "more than adequate to qualify [the report] as testimonial."[123] In *Bullcoming* and *Melendez-Diaz*, the analysts "prepared a certificate concerning the result of [their] analysis" and "formalized" the report in a "signed document headed 'a report.'"[124] And in *Bullcoming*, the report "contain[ed] a legend referring to municipal and magistrate courts' rules that provide for the admission of certified blood-alcohol analyses."[125]

So too here, the autopsy report is headed "REPORT OF AUTOPSY" and bears the official seal of the Office of the Chief Medical Examiner of the City of New York.[126] Dr. Maloney certified and signed the report, indicating a "draft" date and a "final"

---

[122] *Bullcoming*, 564 U.S. at 665; *Melendez-Diaz*, 557 U.S. at 309, 311; N.Y. C.P.L.R § 4518, 4520; N.Y. Pub. Health Law § 4103(3); N.Y. County Law § 677(4) (requiring all autopsy reports finding homicide to be sent to the District Attorney); *see also* N.Y. City Charter § 557(g); N.Y. County Law § 674(2),(3)(a) (requiring the medical examiner to "fully investigate the essential facts concerning the" homicide); N.Y. County Law § 674(4), 676 (granting the medical examiner subpoena power and the power to employ a stenographer to record witness testimony). .

[123] *Bullcoming*, 564 U.S. at 664-65.

[124] *Bullcoming*, 564 U.S. at 664-65; *Melendez-Diaz*, 557 U.S. at 308.

[125] *Bullcoming*, 564 U.S. at 664-65.

[126] A909.

date.[127] In turn, the Office of the Chief Medical Examiner formally certified the report as a business record for purposes of litigation, expressly citing state law authorizing the report's admission into evidence.[128] The "formalities attending" this report are thus just like those attending the reports in *Bullcoming* and *Melendez-Diaz*.

As the facts of *Bullcoming* and *Melendez-Diaz* are "materially indistinguishable" from those present here, the Appellate Division's decision was "contrary to" clearly-established Supreme Court precedent. Thus, the writ should issue.

### D. The Appellate Division unreasonably applied the primary-purpose standard.

For reasons similar to those stated above,[129] no reasonable application of the clearly-established primary purpose standard supports the Appellate Division's decision.

The *only* purpose, and certainly the primary purpose, of the formalized and certified autopsy report was to make a record that "would be available for use at a later trial."[130] When—in the midst of a homicide investigation—a medical examiner concludes that the cause of death is homicide and justifies that conclusion with specific

---

[127] A910, A914.

[128] A908.

[129] *See Williams*, 529 U.S. at 385 (Stevens, J., plurality) (the "contrary to" and "unreasonable application" standards have an "overlapping meaning").

[130] *Melendez-Diaz*, 557 U.S. at 310-11; *Bullcoming*, 564 U.S. at 663; *Bryant*, 562 U.S. at 357; *Davis*, 547 U.S. at 822; *Crawford*, 541 U.S. at 51-52.

observations and findings, the report's "*sole* purpose" is to codify evidence for trial.[131]

That is even more true when, as in New York, state law mandates that the medical

examiner forward an inculpatory report to the District Attorney and renders the re-

port admissible as "prima facie" evidence of the facts stated therein.[132]

Accordingly, the Appellate Division's determination that Mr. Garlick lacked the

right to confront the medical examiner who prepared the autopsy report constituted

an unreasonable application of clearly-established Supreme Court precedent.

### E. The constitutional violation was not harmless.

As the autopsy report played a critical role in this prosecution, this constitutional

violation had a "substantial and injurious effect or influence" on the verdict.[133]

The autopsy report was crucial to the State's first-degree manslaughter case. The

State persuasively used the report at trial to pinpoint the cause and manner of death.

In doing so, the State used the report to rule out Rivera's forceful blows to the head

---

[131] *Melendez-Diaz*, 557 U.S. at 310-11 (emphasis added by the Supreme Court); *see also Rosario v. State*, 175 So.3d 843, 854-58 (Fla. App. 2015) (holding that an autopsy report created during a homicide investigation and asserting that the cause of death was homicide was testimonial); *Commonwealth v. Carr*, 986 N.E.2d 380, 398-400 (Mass. 2013) (same); *Miller v. State*, 313 P.3d 934, 967-70 (Okla. Crim. App. 2013) (same); *State v. Navarette*, 294 P.3d 435, 440-42 (N.M. 2013); *State v. Kennedy*, 735 S.E.2d 905, 916-17 (W. Va. 2012); *United States v. Ignasiak*, 667 F.3d 1217, 1229-35 (11th Cir. 2012); *United States v. Moore*, 651 F.3d 30, 69-74 (D.C. Cir. 2011); *cf. James*, 712 F.3d at 98-99 (where the cause of death appeared to be suicide or accidental poisoning due to drug overdose, and the autopsy report did not even find that the cause of death was homicide, the autopsy report was not testimonial since "there is no suggestion that [the medical examiner who performed the autopsy] or anyone else involved in this autopsy process suspected that [the victim] had been murdered and that the medical examiner's report would be used at a criminal trial").

[132] N.Y. County Law § 677(4); N.Y. City Charter § 557(g); C.P.L.R § 4518, 4520; N.Y. Pub. Health Law § 4103(3); *see also Ignasiak*, 667 F.3d at 1229-35 (autopsy report was testimonial because Florida law required the medical examiner to report the cause of death to the prosecution and to materially assist in the investigation).

[133] *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993).

as the cause of the death. Indeed, without the report, there would have been *no* medical evidence indicating that Mr. Garlick caused the death. Under those circumstances, the jury would have been hard-pressed to find Mr. Garlick guilty of homicide. The report was so valuable that it even caused police and prosecutors to drop their theory that Rivera committed homicide and to instead lay the blame solely on Mr. Garlick.

The report was also crucial evidence of intent to cause serious physical injury. In his statement to the police, Mr. Garlick expressly stated that he did not intend to hurt Mr. Sherwood. Further, the surveillance footage indicated that Mr. Garlick might very well have unintentionally cut Sherwood during a struggle for a knife. But the autopsy report demolished that contention as it declared that the cause of death was a stab wound with a "depth of penetration" of "4-1/2 to 5-1/2" inches. Dr. Maloney further asserted that the stabbing pierced the heart and caused the loss of 1.5 liters of blood. The prosecutor emphasized these findings in summation, painting the picture of an effort to cause serious harm.[134]

As the autopsy report unquestionably played an important role in the jury's assessment of the cause of death and mens rea, its admission was not harmless.[135]

---

[134] *Ocamp v. Vail*, 649 F.3d 1098, 1114-17 (9th Cir. 2011).

[135] *People v. Lopez*, 72 A.D.3d 593, 593 (1st Dept. 2010) (depth of stab wound confirmed intent to cause serious injury).

### F.  Mr. Garlick exhausted this federal constitutional claim.

Mr. Garlick exhausted this federal Sixth Amendment claim because he challenged, at every level of the state proceedings, the admission of the autopsy report on the grounds that it was testimonial under the Sixth Amendment and the Supreme Court's Confrontation Clause precedents.[136]

Further, this petition is timely filed as it has been filed within a year of December 4, 2017, the date the Supreme Court denied Mr. Garlick's petition for a writ of certiorari.[137]

---

[136] A173-79; A211-13; A754-A905; 28 U.S.C. § 2254(b)(1)(A),(c); *O'Sullivan v. Boerckel*, 526 U.S. 838 (1999).

[137] 28 U.S.C. § 2244(d)(1)(A); *Clay v. United States*, 537 U.S. 522, 527 (2003); *Williams v. Artuz*, 237 F.3d 147, 151 (2d Cir. 2000). This is also Mr. Garlick's first habeas petition challenging the instant conviction.

## CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus should be granted.

Respectfully submitted,

Robert S. Dean (RD-0772)
Attorney for Petitioner
Center for Appellate Litigation
120 Wall Street, 28th Floor
New York, New York 10005
(212) 577-2523, ext. 502
rdean@cfal.org

BY _____

Katharine Skolnick (KS-1123)
*Of Counsel*
ksolnick@cfal.org, ext. 501

November 27, 2018