UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JAMES GARLICK, | |
| Petitioner, | |
| -v- | CIVIL ACTION NO.: 18 Civ. 11038 (CM) (SLC) |
| SUPERINTENDENT CHRISTOPHER L. MILLER, Great Meadows Correctional Facility, | **REPORT AND RECOMMENDATION** |
| Respondent. | |

**SARAH L. CAVE,** United States Magistrate Judge.

**TO THE HONORABLE COLLEEN McMAHON**, Chief United States District Judge, Southern District of New York:

## I.    INTRODUCTION

Petitioner James Garlick, who is incarcerated at Green Meadows Correctional Facility, filed a petition pursuant to 28 U.S.C. § 2254 seeking a writ of habeas corpus (the "Petition") on the grounds that the trial court violated the Confrontation Clause of the Sixth Amendment when it permitted the prosecution to introduce an autopsy report without producing for cross examination the witness who prepared it (ECF No. 5 at 5), and that the First Department's affirmance of that decision was "contrary to" and constituted an "unreasonable application" of clearly established Supreme Court precedent (ECF No. 4 at 20–21).  Respondent Christopher L. Miller, Superintendent of the Green Meadows Correctional Facility, acting through the Attorney General of the State of New York (the "State"), opposes the Petition on the ground that introduction of the autopsy report at trial and the First Department's rejection of the Confrontation Clause claim were neither contrary to nor an unreasonable application of Supreme Court precedent.  (ECF No. 12 at 9).

For the reasons set forth below, the Court respectfully recommends that the Petition be denied.  Given, however, that the Petition raises significant questions whether, at the time the First Department affirmed Garlick's conviction, the Supreme Court's Confrontation Clause precedent clearly established that an autopsy report was a "testimonial" statement, and if so, whether the First Department's decision was contrary to or involved an unreasonable application of clearly established Federal law, the Court also recommends that a certificate of appealability be granted.

## II.       BACKGROUND

### A.       Factual Background

During the early evening of November 1, 2011, police responded to a report of an assault at an apartment building in the Bronx.  (ECF No. 13-4 at 11; ECF No. 13-5 at 1).  Police Officer Bagan, who was on foot patrol on nearby Fordham Road, responded to the call, and found Gabriel Sherwood ("Sherwood") lying bleeding on the floor in the building lobby.  (ECF No. 13-4 at 11).  Officer Bagan accompanied Sherwood in an ambulance to the hospital, where Sherwood was pronounced dead.  (Id. at 14).

That same evening, Detective Thomas DeGrazia, the lead homicide detective assigned to the case, initiated an investigation and sought video footage of the incident.  (ECF No. 13-5 at 2).  The building's surveillance video showed a man struggling with Sherwood in the lobby, and a female repeatedly striking Sherwood on the head.  (ECF No. 4 at 7).  The two assailants then fled the scene.  (Id.) Surveillance video then showed the same man who had struggled with Sherwood and a second woman enter an apartment building down the street.  (ECF No. 13-6 at 22).

1.    **Identifying the suspects**

Later that evening, police identified one of the women in the video as Lisa Rivera.  (ECF No. 13-5 at 2).  After interviewing Lisa Rivera, police identified Johanna Rivera as the woman seen in the video hitting and kicking Sherwood, and promptly arrested her as a suspect in Sherwood's homicide.  (Id. at 3–4).  During her post-arrest interrogation, Johanna Rivera explained that she and Lisa Rivera were being harassed by Sherwood, and implicated Garlick as the male assailant seen in the video.  (Id. at 5; ECF No. 13-1 at 33–34).  The next morning, November 2, 2011, the District Attorney's office authorized an intentional murder charge against Johanna Rivera on the theory that her blows to Sherwood's head caused his death.  (ECF No. 13-6 at 32; ECF No. 13-8 at 1–4).  At 4:45 a.m. on November 2, 2011, Detective DeGrazia issued a department-wide notification (an "I-Card") to arrest Garlick for his involvement in the apparent homicide.  (ECF No. 13-5 at 5).

On November 11, 2011 the police arrested Garlick on a charge of murder.  (Id.)  In his oral and written statements following his arrest, Garlick stated that he had arrived at the scene because Sherwood was sexually harassing his girlfriend, Lisa Rivera.  (Id. at 11, 14).  He claimed that when he arrived, he and Sherwood began fighting outside of the apartment building and then moved into the lobby.  (Id. at 15).  Garlick stated that Sherwood brandished what he thought was a weapon and that the two struggled for it.  (Id.)  He told his interrogators that he did not have a knife and that all he was trying to do was defend himself and his girlfriend.  (Id. at 11, 15).  He apologized, stating, "I wasn't trying to hurt anybody."  (Id. at 15).

2.     **The Autopsy Report**

On November 1, 2011, the evening of Sherwood's death, staff at the New York City Office of the Chief Medical Examiner ("OCME")—the agency that determines cause of death in homicide or suspicious cases—discussed the examination of Sherwood's body with Detective DeGrazia and arranged for the body's transport.[1]  (ECF No. 13 at 24; ECF No. 11-7 at 17).  Detective DeGrazia told the OCME staff that the body had multiple stab wounds, and that he was in the process of securing additional information about the incident.  (ECF No. 11-7 at 17).

With the information from Detective DeGrazia, OCME then prepared a "Notice of Death" form, which stated:  "Circumstances of death: App. manner: Homicide."  (Id. at 18).  OCME also prepared a "Supplemental Case Information" sheet, which documented the conversation with Detective DeGrazia (a "call was placed to the 52nd PCT Detective Squad . . . and conversation was had with Detective Tommy Degrasio [sic] who is assigned to the case"), and noted that Sherwood was found with "multiple (4) stab wounds" in the lobby of a Bronx apartment building.  (ECF No. 4 at 8; ECF No. 11-7 at 17).

The next day, November 2, 2011, Dr. Katherine Maloney of the OCME performed an autopsy on Sherwood.  (ECF No. 13 at 29).  Another pathologist, Dr. James Gill, was present during

---

[1] See N.Y. County Law § 673 ("A coroner or medical examiner has jurisdiction and authority to investigate the death of every person dying within his county, or whose body is found within the county, which is or appears to be:  (a)  A violent death, whether by criminal violence, suicide or casualty; (b)  A death caused by unlawful act or criminal neglect; (c)  A death occurring in a suspicious, unusual or unexplained manner; (d)  A death caused by suspected criminal abortion; (e)  A death while unattended by a physician, so far as can be discovered, or where no physician able to certify the cause of death as provided in the public health law and in form as prescribed by the commissioner of health can be found; [and] (f)  A death of a person confined in a public institution other than a hospital, infirmary or nursing home.").

the examination, as were two Bronx homicide detectives, Detectives Speranza and Farmer.  (ECF No. 13-6 at 25; ECF No. 11-7 at 4, 20 ("Det. Speranza Bx Homicide present @ autopsy 11-02-11")).

On the same day she performed the autopsy, Dr. Maloney prepared an autopsy report (the "Autopsy Report"), which declared that Sherwood's cause of death was a "stab wound of torso with perforation of heart" and that the manner of death was "homicide."  (ECF No. 11-7 at 3).  The "Case Worksheet," prepared at the same time, repeated that finding, indicating that the perceived immediate cause of death was a "stab wound of torso with perforation of heart." (Id. at 13).  After Dr. Maloney notified the police of her findings, the police decided not to pursue the murder charge against Johanna Rivera and instead sought to charge Garlick with murder because, as Detective DeGrazia later testified, "the medical examiner made it clear that it was the stab wounds that caused the death."  (ECF No. 13-7 at 23).

On December 29, 2011, after OCME received the toxicology and microscopic analysis reports (dated December 21, 2011 and December 29, 2011, respectively), Dr. Maloney finalized the Autopsy Report.  (ECF No. 11-7 at 8–10).  Dr. Maloney certified that she performed the autopsy, signed the Autopsy Report, and OCME certified the Autopsy Report as a business record under New York's statutory business-record rule and affixed the official OCME seal.  (Id. at 2–8). As mandated by state and local laws,[2] OCME delivered the Autopsy Report to the Bronx District Attorney's office after it was signed.  (ECF No. 4 at 9).

---

[2] See N.Y. County Law § 677(4) ("The . . . medical examiner shall promptly deliver to the district attorney copies of all records pertaining to any death whenever, in his opinion, or in the judgment of the person performing the autopsy, there is any indication that a crime was committed."); see also N.Y. City Charter § 557(g) (same); N.Y. C.P.L.R. § 4520 ("Where a public officer is required or authorized, by special provision of law, to make a certificate or affidavit to a fact ascertained, or an act performed, by him in the course of his official duty, and to file or deposit it in a public office of the state, the certificate or affidavit so filed or deposited is prima facie evidence of the facts stated."); N.Y. Pub. Health Law § 4103(3) ("A certified copy of the record of a birth or death, a certification of birth or death, a transcript of a birth or death certificate, a certificate of birth data or a certificate of registration of birth,

### B.    Procedural History

#### 1.    Indictment

On November 28, 2011, Garlick was indicted on charges of Second Degree Murder (Penal Law § 125.25(1)), First Degree Manslaughter (Penal Law § 125.20(1)), First Degree Assault (Penal Law § 120.10(1)), and Second Degree Assault (Penal Law § 120.05 (2)).  (Bronx Cty. Ind. No. 3681/11; ECF No. 11-2 at 7–8).

#### 2.    Trial

At trial, the State introduced the Autopsy Report as its first exhibit.  (ECF No. 13 at 34). Garlick's counsel objected to the Autopsy Report as testimonial evidence, citing "[t]he difference . . . between introducing something as a business record and introducing it for the purpose of the opinions and observations contained therein."  (Id. at 31).  The Trial Court admitted the Autopsy Report into evidence as a business record, and, relying on People v. Hall, 84 A.D.3d 79 (1st Dep't 2011), "allow[ed] the People to establish that it's a document that th[e] witness can use to express an opinion based on its contents."  (Id. at 31, 33–34).  The Trial Court told defense counsel he could reiterate his objections as the testimony continued.  (Id.)

Over Garlick's Confrontation Clause objection, the Trial Court permitted Dr. Susan Ely, who did not prepare the Autopsy Report and was not involved in Sherwood's autopsy, to testify about the Autopsy Report.  (See id. 16–34).  The State did not assert that Dr. Maloney or Dr. Gill were unavailable to testify, only that they no longer worked at OCME.  (Id. at 29)  Before Dr. Ely's testimony, Garlick's counsel repeated his Confrontation Clause objection, and reiterated that Dr.

---

when properly certified by the commissioner or persons authorized to act for him, shall be prima facie evidence in all courts and places of the facts therein stated.").

Ely should not be allowed to testify to the Autopsy Report because "she [had] no participation in this autopsy at all" and there could not be "an effective cross-examination" without Dr. Maloney. (Id. at 21).  The Trial Court overruled the objection and allowed Dr. Ely to testify.  (Id. at 23).

Dr. Ely testified as an expert in the fields of clinical, anatomic, and forensic pathology.  (Id. at 28).  She laid the foundation for and testified about the Autopsy Report.  (Id. at 28–29).  At the end of her testimony, Garlick's defense counsel reiterated his "objection to permitting Dr. Ely to testify as to the autopsy report and the introduction of the report," and the Trial Court overruled the objection.  (ECF No. 13-1 at 26).

The State relied on the Autopsy Report throughout the trial.  In its opening statement, the State used the Autopsy Report to describe Sherwood's wounds, the placement of the wounds, and promised that the medical examiner would go through each in detail.  (ECF No. 13 at 2–3).  As noted above, Dr. Ely methodically testified about the contents and conclusions of the Autopsy Report.  (See id. at 28–34; ECF No. 13-1).  The State also used the Autopsy Report to eliminate Johanna Rivera as a potential cause of Sherwood's death, to illustrate Garlick's perceived intent to cause "serious harm," and to support its argument during the charging conference that the jury be allowed to consider a murder charge against Garlick.  (ECF No. 13-11 at 5) ("The testimony from the Medical Examiner is the victim died as a result of the seven knife wounds.").  In its closing argument, the State again relied on the Autopsy Report, describing its conclusions as the "final diagnosis" of Sherwood's "cause of death" (ECF No. 13-12 at 23), and recounting Dr. Ely's testimony about Sherwood's wounds (id. at 26–27).

Ultimately, the jury found Garlick not guilty of the murder charge, but found him guilty of first-degree manslaughter. (ECF No. 4 at 6). The Trial Court sentenced him to 20 years' imprisonment and five years of supervised release. (ECF No. 5 at 1).

### 3.    Direct appeal to the First Department

On appeal to the First Department, Garlick argued that the Autopsy Report was testimonial and therefore inadmissible through a surrogate witness. (ECF No. 11-1 at 49). The State argued that the Confrontation Clause "does not bar the use of out-of-court statements by declarants who are not 'witnesses'—that is, those who do not 'bear testimony.'" (ECF No. 11-2 at 44). The State rested its argument on People v. Freycinet, in which the New York Court of Appeals listed four factors to analyze whether a statement is testimonial: (1) "the extent to which the entity conducting the procedure is an arm of law enforcement;" (2) "whether the contents of the report are a contemporaneous record of objective fact, or reflect the exercise of fallible human judgment;" (3) "whether a pro-law-enforcement bias is likely to influence the contents of the report;" and (4) "whether the report's contents are directly accusatory in the sense that they explicitly link the defendant to the crime." 11 N.Y.3d. 38, 41 (2008) (internal citations omitted).

The First Department held that the introduction of the Autopsy Report through Dr. Ely, who was not involved in Sherwood's autopsy, did not violate Garlick's Confrontation Clause right because the Autopsy Report, which "'[did] not link the commission of the crime to a particular person,' was not testimonial (People v. John, 27 NY3d 294, 315 [2016])." People v. Garlick, 144 A.D.3d 605, 606 (1st Dep't 2016). The First Department cited People v. Acevedo, 112 A.D.3d 454, 455 (1st Dep't 2013) in rejecting Garlick's "contention that People v. Freycinet (11 NY3d 38 [2008]) has been undermined by subsequent decisions of the United States Supreme Court." Id.

### 4.    Discretionary appeals

On March 3, 2017, the New York Court of Appeals denied leave to appeal, People v. Garlick, 29 N.Y.3d 948 (2017), and on December 4, 2017, the United States Supreme Court denied Garlick's petition for a writ of certiorari.  Garlick v. New York, 138 S. Ct. 502 (2017).

### C.    Federal Habeas Corpus Petition

### 1.    Garlick's arguments

In his Petition, Garlick argues that the trial court violated the Sixth Amendment's Confrontation Clause when it permitted the State to introduce the Autopsy Report at trial without producing for cross examination the witness who prepared it (ECF No. 5 at 5), and that the First Department's affirmance was "contrary to" and constituted an "unreasonable application" of clearly established Supreme Court precedent (ECF No. 4 at 20).  Garlick argues that, by holding that an autopsy report is not testimonial unless it "link[s] a defendant with a crime," the First Department's decision contradicted the Supreme Court's holding in Melendez-Diaz v. Massachusetts, 557 U.S. 305 (2009), which established that the Confrontation Clause is not limited to evidence that identifies the defendant.  (ECF No. 4 at 22).  He asserts that under Melendez-Diaz, the First Department was required to consider whether the Autopsy Report's primary purpose was to "establish or prove past events potentially relevant to later criminal prosecution" (id. at 24 (quoting Michigan v. Bryant, 562 U.S. 344, 357 (2011) and Melendez-Diaz, 577 U.S. at 310)), but that, instead, it violated clearly established Confrontation Clause precedent when it considered whether the Autopsy Report directly linked Garlick to the crime.  (Id.)

In the alternative, Garlick argues that even if a link to a specific defendant is required for a statement to be testimonial, the Autopsy Report here was testimonial because, before the

autopsy was performed, police had identified Garlick as a suspect and had issued the I-Card for his arrest.  (Id. at 28–29).  He asserts that, because the State had already isolated Garlick as a suspect, the determination that Sherwood's death was a homicide implicated Garlick in his death. (Id.)

Finally, Garlick argues that the Autopsy Report meets the formality requirements of a testimonial document, and that admitting the Autopsy Report into evidence without making its author available for cross examination was not harmless error.  (Id. at 31–33).

### 2.     The State's arguments

In opposition to the Petition, the State argues that the Trial Court's decision was neither contrary to nor an unreasonable application of Supreme Court precedent because the Supreme Court has not specifically addressed whether an autopsy report is testimonial.  (ECF No. 12 at 10). The State argues that the state courts correctly applied that precedent, and that Melendez-Diaz and Bullcoming v. New Mexico, 564 U.S. 647 (2011), are distinguishable because the reports in those cases "directly linked the accused to the charged crime."  (Id. at 17–18).  Here, the State argues, Dr. Maloney did not know the suspect's identity or that the police were conducting a homicide investigation, and thus the Autopsy Report could not have directly targeted Garlick.  (Id. at 20–21).

Finally, the State argues that even if Melendez-Diaz and Bullcoming are controlling, the Autopsy Report here was not "formalized," and any error in admitting the Autopsy Report using Dr. Ely instead of Dr. Maloney was harmless.  (Id. at 24 n.7, 25–26).[3]

---

[3] On November 21, 2019, this Court heard oral arguments on the Petition.

### III.     DISCUSSION

**A.     Applicable Legal Standards**

**1.     Exhaustion**

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may not consider a petition for a writ of habeas corpus by a prisoner in state custody unless the petitioner has exhausted all state judicial remedies.  28 U.S.C. § 2254(b)(1)(A); see Jackson v. Conway, 763 F.3d 115, 133 (2d Cir. 2014).  To satisfy the exhaustion requirement, the petitioner must have "fairly presented" his claims to the state courts, thereby affording those courts the opportunity to correct the alleged violations of federal rights.  Picard v. Connor, 404 U.S. 270, 275 (1971).  The exhaustion requirement is fulfilled once the federal claims have been presented to "the highest court of the state."  Galdamez v. Keane, 394 F.3d 68, 73 (2d Cir. 2005) (internal citation omitted).

Here, Garlick raised his Confrontation Clause claim on direct appeal to the First Department and in seeking leave to appeal to the Court of Appeals.  Garlick, 144 A.D.3d at 605; Garlick, 29 N.Y.3d at 948.  He has therefore exhausted his claim for the purposes of federal court review.  See Galdamez, 394 F.3d at 74 (explaining that "one complete round" of New York's appellate review process involves appeal to Appellate Division and then application to Court of Appeals for certificate granting leave to appeal).  Further, the Petition is timely because it was filed on November 28, 2018, within one year of December 4, 2017, the date on which the Supreme Court denied Garlick's petition for writ of certiorari.  Garlick, 138 S. Ct. at 502.

2.     **Standard of Review**

Where the state court has adjudicated the merits of a claim, this Court must apply a "highly deferential" standard in reviewing that claim in a habeas corpus proceeding.  28 U.S.C. § 2254(d); Renico v. Lett, 559 U.S. 766, 773 (2010); Williams v. Taylor, 529 U.S. 362, 413 (2000). A claim has been "adjudicated on the merits" when the state court ruled on the substance of the claim itself, rather than on a procedural or other ground.  See Bell v. Miller, 500 F.3d 149, 154–55 (2d Cir. 2007); Sellan v. Kuhlman, 261 F.3d 303, 311 (2d Cir. 2001) (noting that "adjudicated on the merits" means "a decision finally resolving the parties' claims, with res judicata effect, that is based on the substance of the claim advanced").

Here, the First Department considered and rejected Garlick's Confrontation Clause objection on its merits.  Garlick, 144 A.D.3d at 605.  Therefore, this Court must adhere to the standard of review set forth in section 2254(d), which permits, in relevant part, a court to grant a writ of habeas corpus on a claim that has been previously adjudicated on the merits by a state court only if the state adjudication:

(1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or,

(2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)–(2).

a)     **Clearly established federal law**

The relevant date for determining applicable "clearly established Supreme Court law" is the date of the last state court adjudication of the petitioner's claim "on the merits."  Greene v.

Fisher, 565 U.S. 34, 40 (2011).  Here, that date is November 29, 2016, the date of the First

Department's decision affirming Garlick's conviction.  See DeJesus v. Superintendent of Attica

Corr. Facility, No. 17 Civ. 3932 (GBD) (AJP), 2017 WL 6398338, at *14 (S.D.N.Y. Dec. 13, 2017)

("The relevant Supreme Court jurisprudence is that in effect at the time of the state court's

adjudication on the merits (in New York, usually the decision of the Appellate Division), not at

the time of a subsequent decision (e.g., the New York Court of Appeals) denying leave to

appeal.").

As to what constitutes clearly established federal law, "a principle is clearly established

Federal Law for § 2254(d)(1) purposes only when it is embodied in a Supreme Court holding,

framed at the appropriate level of generality."  Washington v. Griffin, 876 F.3d 395, 403 (2d Cir.

2017) (internal citations omitted).  In White v. Woodall, the Supreme Court discussed "clearly

established Federal law" in the habeas context:

> Section 2254(d)(1) provides a remedy for instances in which a state
> court unreasonably applies this Court's precedent; it does not require
> state courts to extend that precedent or license federal courts to treat
> the failure to do so as error.  Thus, if a habeas court must extend a
> rationale before it can apply it to the facts at hand, then by definition
> the rationale was not clearly established at the time of the state-court
> decision.

The Court went on to explain:

> This is not to say that §2254(d)(1) requires an identical factual pattern
> before a legal rule must be applied.  To the contrary, state courts must
> reasonably apply the rules "squarely established" by this Court's
> holdings to the facts of each case.

572 U.S. 415, 426–27 (2014) (internal citations omitted).

Federal courts have reached differing conclusions as to what constitutes "clearly

established" law for purposes of section 2254 in this context.  The Sixth Circuit found Supreme

Court Confrontation Clause precedent to be clearly established as of 2008.  See McCarley v. Kelly, 801 F.3d 652, 664–65 (6th Cir. 2015) (finding that, by 2008, after Crawford and Davis, the state of the Supreme Court's Confrontation Clause precedent was clearly established).  In contrast, one court in this District found the state of the law to be unsettled as of the same time period.  See Soler v. United States, No. 15 Civ. 4342 (LAP), 2015 WL 4879170, at *14–16 (S.D.N.Y. Aug. 14, 2015) (finding Confrontation Clause precedent as to testimonial statements at the time of 2007 trial to be unsettled and subsequent case law had not developed a clear set of rules).  The passage of time has not aligned courts' interpretation of how to define "testimonial" statements for Confrontation Clause purposes.  See, e.g., Hensley v. Roden, 755 F.3d 724, 734 (1st Cir. 2014) (finding the state of the Confrontation Clause precedent as of 2009 uncertain, and rejecting petitioner's claim that testimonial nature of autopsy reports was clearly established).  (See infra § III.C.3 & nn. 11–14).

### b) Contrary to clearly established federal law

Under section 2254(d)(1), a state court decision is "contrary to" clearly established federal law where the state court either applies a rule that contradicts Supreme Court precedent or confronts a case with materially similar facts to a Supreme Court case and arrives at a different result.  See Rosario v. Ercole, 601 F. 3d 118, 123 (2d Cir. 2010) (quoting Williams, 529 U.S. at 412–13).  This is a very high bar to meet.  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."  Woods v. Etherton, 136 S. Ct. 1149, 1151 (2016) (quoting Harrington v. Richter, 562 U.S. 86, 101 (2011)).  In fact, "[t]he state court decision must be so

lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Id. (internal citations omitted).

### c) An unreasonable application of clearly established federal law

An "unreasonable application" of clearly established federal law occurs when the state court identifies and applies the correct governing legal principle, but its application was "objectively unreasonable." Lockyer v. Andrade, 538 U.S. 63, 73–76 (2003) (citing Williams, 529 U.S. at 409). Under section 2254(d)(2), the Court must consider the reasonableness of the decision in light of the evidence presented at the proceeding under review. See Cardoza v. Rock, 731 F.3d 169, 182 (2d Cir. 2013). Even if the standard under section 2254(d)(2) is met, the petitioner "still bears the ultimate burden of proving by a preponderance of the evidence that his constitutional rights have been violated." Id. (internal citation omitted). The question under the AEDPA "is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable, which is a substantially higher threshold." Schriro v. Landrigan, 550 U.S. 465, 473 (2007).

### d) Harmless error

A Confrontation Clause violation is considered harmless error unless it "had substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946); accord Fry v. Pliler, 551 U.S. 112, 116, 121–22 (2007) (clarifying that the Brecht standard applies when reviewing a state court judgment under 28 U.S.C. § 2254(d)). When considering whether a limit or preclusion of cross examination was harmless error, courts consider: "(1) the strength of the state's case; (2) the importance of the witness's testimony; (3) whether the excluded testimony

would have been cumulative; (4) the presence of evidence that would have corroborated the testimony; and (5) the extent of the cross-examination that was permitted." McGhee v. Uhler, No. 17 Civ. 1103 (CM) (SDA), 2019 WL 4228352, at *9 (Apr. 18, 2019). See also Nappi v. Yelich, 793 F.3d 246, 252 (2d Cir. 2015); Brinson v. Walker, 547 F.3d 387, 395 (2d Cir. 2008). Courts in this Circuit also "consider a sixth factor in addition to the Supreme Court's five: '[W]hether the cross-examination of which the defendant was deprived was of a nature that was likely to affect the result.'" Alvarez v. Ercole, 763 F.3d 223, 233 (2d Cir. 2014) (quoting Brinson, 547 F.3d at 396).

### B.   Confrontation Clause Claim

Garlick argues that the First Department's decision was "contrary to" and constituted an "unreasonable application" of clearly established Supreme Court precedent. (ECF No. 5 at 5). The Supreme Court's modern Confrontation Clause jurisprudence has not defined an exhaustive list of "testimonial" statements, and, as a result, lower courts apply by extension and analogy the principles set forth in the Supreme Court's Confrontation Clause cases, namely, Crawford v. Washington, 541 U.S. 36 (2004), Melendez-Diaz v. Massachusetts, 557 U.S. 305 (2009), Bullcoming v. New Mexico, 564 U.S. 647 (2011), and Williams v. Illinois, 567 U.S. 50 (2012).

### 1.   The status of Confrontation Clause precedent

"Clearly established" Supreme Court precedent refers to the state of the law as of the date of the First Department's decision, and thus this Court must review Supreme Court Confrontation Clause precedent as of November 29, 2016. Garlick, 144 A.D.3d at 605; see Greene, 565 U.S. at 40; DeJesus, 2017 WL 6398338, at *14. Although certain Confrontation Clause principles can be divined from Crawford and its progeny, as set forth below, what

constitutes "clearly established" law for purposes of section 2254 review, however, is a more complicated matter.

### a)      The Confrontation Clause

The Sixth Amendment's Confrontation Clause provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  U.S. Const. amend. VI.  In <u>Ohio v. Roberts</u>, 448 U.S. 56 (1980), the Supreme Court established that the out-of-court statement of an unavailable witness was admissible provided it has adequate indicia of reliability, <u>i.e.</u>, it fell within a "firmly rooted hearsay exception" or bore "particularized guarantees of trustworthiness."  448 U.S. at 66.

### b)      Crawford v. Washington

In <u>Crawford v. Washington</u>, the Supreme Court revisited its Confrontation Clause precedent, abrogating its decision in <u>Roberts</u>, and establishing modern Confrontation Clause standards.  541 U.S. 36 (2004).  Following a historical analysis of the Confrontation Clause, the Court held in <u>Crawford</u> that the "indicia of reliability" test impermissibly relied on tenants of evidence law, rather than following the procedure of examination prescribed in the Constitution, namely, confrontation through cross examination.  <u>Id.</u> at 51 ("Leaving the regulation of out-of-court statements to the law of evidence would render the Confrontation Clause powerless to prevent even the most flagrant inquisitorial practices.").  The Court emphasized in <u>Crawford</u> that, regardless of reliability, the Constitution requires confrontation for testimonial evidence to be admitted against a criminal defendant.  <u>Id.</u> at 68–69 ("Where testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one that the Constitution actually prescribes:  confrontation.").

As to whether a statement is testimonial, the Court in Crawford looked to the definition of "testimony" as of 1828:  "[a] solemn declaration or affirmation made for the purposes of establishing or proving some fact."  Id. at 51 (citing 2 N. Webster, Am. Dictionary of the English Language (1828)).   The Court then set out two additional formulations of a "testimonial" statement:  (1) statements that were "ex parte in-court testimony or its functional equivalent— that, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially," and (2) "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial."  Id. at 51–52.

Applying this framework, the Court considered whether the tape-recorded statement to police made by the wife of for the defendant, who was accused of stabbing another man, could be entered into evidence, even though the wife was exempt from cross examination by the marital privilege.  Id. at 40.  The Court held that the wife's statements were testimonial, and thus their admission into evidence without the opportunity for cross examination violated the Confrontation Clause.  Id. at 67–69 ("The Constitution prescribes a procedure for determining the reliability of testimony in criminal trials, and we, no less than the state courts, lack authority to replace it with one of our own devising.").

Following Crawford, then, lower courts essentially had a Confrontation Clause tool-box containing a small category of explicitly testimonial statements, a Court-endorsed definition of "testimony," and two formulations to determine whether a statement is testimonial:  (1) "ex parte in-court testimony or its functional equivalent—that is, material such as affidavits, custodial

examinations, prior testimony that the defendant was unable to cross examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially," and (2) "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." Id. at 51–52.

### c) Melendez-Diaz v. Massachusetts

Five years later in Melendez-Diaz v. Massachusetts, the Supreme Court again addressed the testimonial standard, this time as applied to certificates attesting to the laboratory analysis of a suspected controlled substance. 557 U.S. 305 (2009).

After seizing a substance during Melendez-Diaz's arrest, police submitted a sample of the substance to the state laboratory for chemical analysis. Id. at 308. At trial, the prosecution introduced three "certificates of analysis" indicating that the substance was cocaine. Id. Melendez-Diaz objected to the admission of the certificates, arguing that Crawford required the analysts who performed the chemical analyses to testify in person. Id. at 309. The trial court overruled the objection, and admitted the certificates into evidence, a decision the appellate court affirmed. Id.

On its review, the Supreme Court began by reiterating the testimonial formulations described in Crawford: whether the statement was "ex-parte in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was able to cross examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially"; whether the statement was "contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions"; and whether the "[s]tatements [] were made under circumstances which would lead an objective

witness reasonably to believe that the statement would be available for use at a later trial." Id. at 310 (quoting Crawford, 541 U.S. at 51–52).

Applying these formulations, the Court stated that there was "little doubt that the documents in this case fall within the core class of testimonial statements thus described." Id. (internal citation omitted). The Court explained that, although Massachusetts labeled the documents "certificates," they were "quite plainly affidavits" because they were notarized and were "incontrovertibly" a "solemn declaration or affirmation made for the purpose of establishing or proving some fact." Id. (quoting Crawford, 541 U.S. at 51). Thus, the certificates were functionally equivalent to live, in-court testimony. Id. at 310–11. Further, the Court found that the affidavits were "'made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.'" Id. at 311 (quoting Crawford, 541 U.S. at 52). The Court demonstrated that under any of these formulations, the certificates were testimonial and could not be admitted against a defendant unless he had the opportunity to cross examine the analyst who had conducted the test.

The Court then assessed and rejected each of the prosecution's arguments. First, the prosecution argued that "the analysts [were] not subject to confrontation because they [were] not 'accusatory' witnesses, in that they [did] not directly accuse the petitioner of wrongdoing; rather, their testimony [was] inculpatory only when taken together with other evidence" that linked the conclusions in the certificates to Melendez-Diaz. Id. at 313. The Court rejected the proposition that statements are not "testimonial" unless they identify or accuse a specific witness as an argument that "finds no support in the text of the Sixth Amendment or our case law." Id. In fact, the Court explained, the Confrontation Clause and adjacent Compulsory Process Clause

set up a clear dichotomy of witnesses against a criminal defendant:  those against him, whom the defendant has the right to confront, and those in his favor:  "[t]he prosecution <u>must</u> produce the former; the defendant <u>may</u> call the latter . . . there is not a third category of witnesses, helpful to the prosecution, but somehow immune from confrontation."  <u>Id.</u> at 313–14.  Thus, the Court held, a statement need not identify a specific suspect for it to be testimonial under the Confrontation Clause.  <u>Id.</u>

Second, the prosecution argued that the analysts should be immune from confrontation because they were not "conventional" witnesses "whose <u>ex parte</u> testimony was most notoriously used at the trial of Sir Walter Raleigh," which had "long been thought a paradigmatic confrontation violation" that exemplified "the core of the right to confrontation[.]"  <u>Id.</u> at 315 (quoting <u>Crawford</u>, 341 U.S. at 52).  The Court noted that conventional witnesses "recall[] events observed in the past," and that the analysts in <u>Melendez-Diaz</u> "observe[d] neither the crime nor any human action related to it."  <u>Id.</u> at 315–16.  The Court found no basis for limiting the confrontation right based on the "conventionality" of the witnesses and rejected the notion that a witness must observe a crime or related activity for confrontation to be required.  <u>Id.</u> at 315–16 ("The dissent provides no authority for this particular limitation of the type of witnesses subject to confrontation.").

Third, the prosecution contended that there was a difference between testimony that was "prone to distortion or manipulation" and the testimony in <u>Melendez-Diaz</u>, which it described as the "result of neutral, scientific testing."  <u>Id.</u> at 317 (internal citation omitted).  The Court rejected this argument, stating that it was "little more than an invitation to return to [the] overruled decision in <u>Roberts</u>," which used the purported reliability and trustworthiness of

evidence at issue to determine when cross examination was necessary.  Id. at 318.  The Court explained that statements that are the result of supposedly "neutral, scientific testing" should still be subject to the rigor of cross examination because not only are such tests not "as neutral or as reliable" as suggested, but they are not "uniquely immune from the risk of manipulation." Id.  The Court elaborated that confrontation "is designed to weed out not only the fraudulent analyst, but the incompetent one as well." Id. at 319.  Because "[s]erious deficiencies" have been found in the forensic evidence used in criminal trials, "an analyst's lack of proper training or deficiency in judgment may be disclosed in cross-examination." Id. at 319–20.

Discussing forensic evidence more generally, the Court noted that even scientific tests and expert analysts rely on subjective decisions, such as which tests to perform and how to interpret the results.  See id. at 320.  This inevitable subjective element, "presents a risk of error that might be explored on cross-examination."   Id.   Quoting a National Academy of Sciences report, the Court discussed the "wide variability across forensic science disciplines with regard to techniques, methodologies, reliability, types and numbers of potential errors, research, general acceptability, and published material." Id. at 320–21.

Fourth, the prosecution argued that the "analysts' affidavits are admissible without confrontation because they are akin to the types of official and business records admissible at common law." Id. at 321 (internal citation omitted).  The Court explained that the certificates at issue did not qualify as traditional official or business records, but even if they did, "their authors would be subject to confrontation nonetheless." Id.  Thus, although Federal Rule of Evidence 803 sets forth exceptions to the general prohibition against the entry of hearsay evidence, including that documents kept in the regular course of business may ordinarily be admitted at trial despite

their hearsay status, the Court explained, "that is not the case if the regularly conducted business activity is the production for evidence for use at trial." Id.

The Court clarified that "[b]usiness and public records are generally admissible absent confrontation not because they qualify under an exception to the hearsay rules, but because— having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial—they are not testimonial." Id. at 324. The Court distinguished the accident reports in Palmer v. Hoffman, which, even though kept in the regular course of business, were not admissible without confrontation because they were "calculated for use essentially in the court, not in business." Id. at 321 (quoting Palmer v. Hoffman, 318 U.S. 109, 114 (1943)). Thus, even though functionally similar to other business records, whether the statements contained in those records were testimonial was a separate question, and the one that determined whether confrontation of the declarant was required under the Sixth Amendment. The Court also noted that the certificates at issue in Melendez-Diaz were not admissible as public records because Federal Rule of Evidence 803(8) specifically excludes "matter[s] observed by law-enforcement personnel" in a criminal case, and thus required confrontation through cross examination. Id. Thus, even if a statement qualifies as a business or public record, the declarant must testify to the statement if it is testimonial under one of the tests endorsed by the Court.

In sum, the Court in Melendez-Diaz rejected the concepts that:  (1) a statement is not testimonial unless it directly accuses a known suspect, 557 U.S. at 313; (2) testimonial statements can only be made by "conventional witnesses," id. at 315; (3) evidence produced as the "result[t] of neutral, scientific testing" is not testimonial, id. at 317; and (4) business and public records are

admissible without confrontation because such records were "admissible at common law," id. at 321 (internal citations omitted).  At the same time, the Court reaffirmed the formulations of testimonial statements outlined in Crawford:  (1) a statement that is "ex-parte in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was able to cross examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially;" (2) an extrajudicial statement "contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions"; or (3) a statement "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial."  Id. at 310.  The Court also reaffirmed the use of the 1828 definition of "testimony" when analyzing whether the documents at issue, here labeled "certificates," were testimonial.  Id. (finding the certificates were "incontrovertibly a 'solemn declaration or affirmation made for the purpose of establishing or proving some fact'").

The Court concluded that because the certificates established the fact that the substance found on the defendant was cocaine, which is the precise testimony the analyst would provide if called at trial, the "certificates [we]re functionally identical to live, in-court testimony, doing precisely what a witness does on direct examination."  Id. at 311–12 (internal citations omitted). Therefore, the Court held that the admission of the certificates into evidence without providing the defendant the opportunity to cross examine the analyst was error.  Id. at 329.

### d)  **Bullcoming v. New Mexico**

In 2011, the Court in Bullcoming v. New Mexico undertook to clarify the contours of the Confrontation Clause in relation to forensic evidence, this time in connection with a blood alcohol

test.  564 U.S. 647 (2011).  Bullcoming was arrested on charges of driving while intoxicated, and

the principal evidence against him was a laboratory report certifying that his blood-alcohol

concentration was above the legal limit.  Id. at 651.

At trial, the prosecution did not call the analyst who signed the laboratory report, and

instead called another analyst who was familiar with the laboratory's testing procedures, but had

no role in testing the sample.  Id.  Over Bullcoming's objection, the trial court admitted the

laboratory report into evidence as a business record, and allowed the prosecution to use a

surrogate witness to testify about the laboratory procedures.  Id. at 656.

On appeal to the New Mexico Supreme Court, and now with the guidance of Melendez-

Diaz, the court held that, like the affidavits in Melendez-Diaz, the blood-alcohol report introduced

at Bullcoming's trial constituted testimonial evidence because it was "functionally identical to

live, in-court testimony, doing precisely what a witness does on direct examination."  Id.  The

court held, however, that the report's admission did not violate the Confrontation Clause

because the analyst "'was a mere scrivener,' who 'simply transcribed the results generated by

the gas chromatograph machine,'" and that the surrogate witness "'qualified as an expert witness

with respect to the gas chromatograph machine.'"  Id. at 657 (internal citations omitted).  Thus,

the New Mexico Supreme Court concluded, there was no Confrontation Clause violation because

Bullcoming could not have cross examined the machine or the written report, and was able to

cross examine "a qualified analyst" who served as an acceptable surrogate.  Id.

The Supreme Court disagreed.  Id.  The Court found that the blood alcohol report was

more than a mere number; it certified that the analyst had received the sample intact, had

checked that the sample corresponded to the correct report number, and had performed a

particular test following a specified protocol.  Id. at 660.  The Court concluded that, "[t]hese representations, relating to past events and human actions not revealed in raw, machine-produced data, are meet for cross-examination." Id. "[T]he comparative reliability of an analyst's testimonial report drawn from machine-produced data does not overcome the Sixth Amendment bar," the Court continued, noting that it had "settled in Crawford that the 'obviou[s] reliab[ility]' of a testimonial statement does not dispense with the Confrontation Clause." Id. at 661 (quoting Crawford, 541 U.S. at 62).

The Supreme Court also disapproved of the use of surrogate expert testimony, because such testimony "could not convey what [the analyst conducting the test] knew or observed about the events his certification concerned, i.e., the particular test and testing process he employed." Id.  Further, surrogate testimony could not "expose any lapses or lies on the certifying analyst's part." Id. at 662.  The Court stated that,

> [m]ore fundamentally, as this Court stressed in Crawford, "[t]he text of the Sixth Amendment does not suggest any open-ended exceptions from the confrontation requirement to be developed by the courts." . . . Accordingly, the Clause does not tolerate dispensing with confrontation simply because the court believes that questioning one witness about another's testimonial statements provides a fair enough opportunity for cross-examination.

Id. (quoting Crawford, 541 U.S. at 54).

The state argued that the affirmations by the analyst were not testimonial because they were observations of an "independent scientis[t]" made "according to a non-adversarial public duty." Id. at 663–64 (internal citation omitted).  The Supreme Court quickly dispensed of this justification as "far[ing] no better here than it did in Melendez-Diaz.  A document created solely for an 'evidentiary purpose,' Melendez-Diaz clarified, made in aid of a police investigation, ranks as testimonial." Id. at 664.  The state attempted to distinguish the certificate at issue from that

in Melendez-Diaz by emphasizing that the report there was sworn before a notary public, in contrast to the blood-alcohol report, which was unsworn.  Id.  The Court disagreed, holding that "[t]he same purpose was served by the certificate in question here" as the certificates in Melendez-Diaz, which the Court held were "'incontrovertibly . . . affirmation[s] made for the purpose of establishing or proving some fact' in a criminal proceeding."  Id. (citing Melendez-Diaz, 557 U.S. at 310).   The Court rejected as overly formalistic and easily avoidable any interpretation of the Confrontation Clause "that would render inadmissible only sworn ex parte statements, while leaving admission of formal, but unsworn statements, 'perfectly OK.'"  Id. at 664.  Rather, the Court held that, "[i]n all material respects, the laboratory report in this case resembles those in Melendez-Diaz."  Id.  The similarities between the report at issue in Bullcoming and those in Melendez-Diaz were intractable:  in both cases, a law-enforcement officer provided seized evidence to a state laboratory required by law to assist in police investigations; both analysts tested the evidence and prepared a certificate containing the result of the analysis; and, both certificates were "formalized" in a signed document labeled "report." Id. at 665.  These elements, the Court held, were "more than adequate to qualify [the analyst's] assertions as testimonial."  Id.  Thus, admission of the report, even as a business record, did not render the report immune from confrontation.  Id.

Justice Sotomayor issued a concurring opinion in which she agreed that the report at issue was testimonial, but wrote separately to highlight her rationale.  Bullcoming, 564 U.S. at 668. Justice Sotomayor explained her position, as outlined in Michigan v. Bryant,[4] that "[t]o determine

---

[4] In Davis v. Washington, the Court considered "when statements made to law enforcement personnel during a 911 call or at a crime scene are 'testimonial' and thus subject to the requirements of the Sixth Amendment's Confrontation Clause."  547 U.S. 813, 817 (2006).  A few years later in Michigan v. Bryant, the Court again considered

if a statement is testimonial, we must decide whether it has 'a primary purpose of creating an

out-of-court substitute for trial testimony.'" Id. at 669. (quoting Bryant, 562 U.S. at 358).  When

the "primary purpose" of a statement is "not to create a record for trial," she continued, "the

admissibility of [the] statement" is governed by the state and federal rules of evidence, rather

than the Confrontation Clause.  Id.  In Bullcoming, as in Melendez-Diaz, she concluded that the

certificates had the "primary purpose of creating an out-of-court substitute for trial testimony"

and were therefore testimonial.  Id. at 670 (quoting Bryant, 562 U.S. at 358).

Justice Sotomayor also found the formality of the statements important to determining

their purpose.  Id. at 671.  Although "'[f]ormality is not the sole touchstone of our primary

purpose inquiry,' a statement's formality or informality can shed light on whether a particular

statement has a primary purpose for use at trial."  Id. (quoting Bryant, 562 U.S. at 366).  Under

this "primary purpose" analysis, Justice Sotomayor agreed that the blood-alcohol certification

---

whether statements made to police were testimonial.  562 U.S. 344 (2011).  In both cases, the Court focused its analysis on the presence of an "ongoing emergency" as an important factor in determining whether such statements were testimonial.  Davis, which also decided the companion case Hammond v. Indiana, No. 05 Civ. 5705, considered statements made to a 911 operator in response to an ongoing domestic assault and statements made to police responding to a report of a domestic disturbance, while Bryant, 562 U.S. at 344, considered statements made to police officers after the declarant had been shot and was found mortally wounded.

In Davis, the Court explained that Crawford set forth "various formulations" of testimonial statements, without endorsing a single test.  Davis, 547 U.S. at 822 (quoting Crawford, 541 U.S. at 52).  For this context, the Court held, "[w]ithout attempting to produce an exhaustive classification" that "[s]tatements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency.  They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution."  Id.

Davis also reaffirmed several formulations of testimonial statements discussed in Crawford.  It reiterated the definition of "testimony" as "'a solemn declaration or affirmation made for the purpose of establishing or proving some fact,'" Davis, 547 U.S. at 824 (quoting Crawford, 652 U.S. at 51), and that formal, ex parte statements and the evidentiary products of such statements are testimonial.  See id.; see also Crawford, 652 U.S. at 51–52.  Notably, Davis also introduced the "primary purpose" language as a formulation to determine whether statements made to police officers are testimonial.

was a formal statement, despite the lack of notarization. Id. Thus, she explained that "the report ha[d] a primary purpose of creating an out-of-court substitute for trial testimony, which renders it testimonial." Id. at 671–72 (internal citations omitted).

In sum, the Bullcoming Court considered and rejected the propositions that: (1) testimonial evidence does not implicate the Confrontation Clause on the basis that the forensic analyst is a "mere scrivener" who "simply transcribed" machine-generated results, id. at 660; (2) testimonial evidence could be subject to cross examination by a surrogate expert witness, and does not require the certifying expert to testify, id. at 664; and, (3) blood-alcohol analysis was not testimonial because the analyst was not "adversarial" or "inquisitorial" because it simply contained observations of an "independent" scientist made "according to a non-adversarial public duty." Id. The Court reaffirmed the formulations of testimony outlined in Crawford: (1) ex parte communications contained in formalized documents are testimonial, even if not sworn before a notary, id. at 664–65, 671; (2) statements made for use at a later trial are testimonial, id. at 664, 670 (Sotomayor, J., concurring); and (3) an out-of-court statement made for the purpose of proving some fact is testimonial, id. at 652. Justice Sotomayor's concurrence employed the primary purpose test for the first time outside of the context of statements to police officers. Id. at 669.

### e)   **Williams v. Illinois**

In its most recent Confrontation Clause case, the Supreme Court addressed whether "Crawford bar[s] an expert from expressing an opinion based on facts about a case that have been made known to the expert but about which the expert is not competent to testify[.]"

Williams v. Illinois, 567 U.S. 50, 56 (2012).  The Justices did not agree on an answer to this question and issued a fractured opinion with no single approach endorsed by a majority.

At Williams's bench trial, a forensic expert at the Illinois State Police laboratory testified about a report that concluded that a DNA profile, prepared by an outside laboratory from the victim's swab, matched a DNA profile produced by the state police from Williams's blood.  Id. at 56.  The expert, who had no role in the DNA analysis, attested to the central issue in the case: that the DNA on the victim's swab matched Williams's DNA profile.  Id.  In response to confrontation clause objections to the expert testimony, the State explained that under Illinois Rule of Evidence 703 (identical to the federal rule), "an expert is allowed to disclose the facts on which the expert's opinion is based, even if the expert is not competent to testify to those underlying facts."  Id. at 63.  The trial judge agreed and declined to exclude the expert's testimony.  Id. at 63–64.  The Illinois Appellate Court and Illinois Supreme Court found no Confrontation Clause violation because the statement that the DNA profiles matched "was not admitted for the truth of the matter asserted; rather, it was offered to provide a basis for [the expert's] opinion."  Id. at 64.

The plurality opinion, written by Justice Alito and joined by Chief Justice Roberts, Justice Kennedy, and Justice Breyer, affirmed the Illinois Supreme Court decision on two independent bases, first, "that this form of expert testimony does not violate the Confrontation Clause because that provision has no application to out-of-court statements that are not offered to prove the truth of the matter asserted," and second, that the report was not testimonial because "it was produced before any suspect was identified," it was not made to obtain evidence, "but for the purpose of finding a rapist who was on the loose," and the report "was not inherently

inculpatory." Id. at 58.  The Williams plurality heavily relied on the fact that the trial had been a bench trial, noting that a jury would be less likely to discern between evidence admitted for its truth and evidence admitted to explain the basis of the expert's opinion.  Id. at 70.

In his concurrence, Justice Thomas agreed with the plurality's judgment, but "share[d] the dissent's view of the plurality's flawed analysis."  Id. at 103–04.  In addition to rejecting the plurality's finding that the DNA report was not offered for its truth, id. at 106, Justice Thomas's testimonial analysis focused solely on the formality of the statement.  Id. at 110–11.  He concluded that the DNA report was "not a statement by a witness within the meaning of the Confrontation Clause" because it lacked "the solemnity of an affidavit or deposition," it was "neither a sworn nor a certified declaration of fact," and it did not "attest that its statements accurately reflect[ed] the DNA testing processes used or the results obtained."  Id. at 111.  He distinguished this report from those in Melendez-Diaz and Bullcoming because, unlike the reports in those cases, the report here "certifie[d] nothing."  Id. at 112.

Justice Thomas also rejected the "primary purpose" test the plurality invoked.  He noted that the original formulation of that test, in Davis, "asked whether the primary purpose of an extrajudicial statement was 'to establish or prove past events potentially relevant to later criminal prosecution.'"  Id. at 113 (quoting Davis, 547 U.S. at 822).  In contrast, "[t]he new primary purpose test asks whether an out-of-court statement has 'the primary purpose of accusing a targeted individual of engaging in criminal conduct.'"  Id. at 114 (quoting plurality op. at 81–82).  He then posited that such a test "lacks any grounding in constitutional text, in history, or in logic."  Id. ("There is no textual justification, however, for limiting the confrontation right to statements made after the accused's identity became known."); id. at 115 ("Historical practice confirms that

a declarant could become a 'witness' before the accused's identity was known."). As in Melendez-Diaz, Justice Thomas read the text of the Sixth Amendment as contemplating "two classes of witnesses—those against the defendant and those in his favor." Id. at 116 (quoting Melendez-Diaz, 557 U.S. at 313–14). He also reiterated the Court's previous finding that these two exclusive categories necessarily preclude a third category of witnesses "helpful to the prosecution, but somehow immune from confrontation" id. (quoting Melendez-Diaz, 557 U.S. at 314), and thus the "distinction between those who make 'inherently inculpatory' statements and those who make other statements that are merely 'helpful to the prosecution' has no foundation in the text of the Amendment." Id.

The dissent, written by Justice Kagan and joined by Justices Scalia, Ginsburg, and Sotomayor, found the DNA report to be testimonial under the Court's Confrontation Clause precedent. Id. at 119. The dissent viewed Justice Alito's plurality opinion as a dissent "in all except its disposition" because "[f]ive Justices specifically reject[ed] every aspect of its reasoning and every paragraph of its explication." Id. at 120. The dissent concluded that the DNA report was "identical to the one in Bullcoming (and Melendez-Diaz) in 'all material respects.'" Id. at 123 (quoting Bullcoming, 564 U.S. at 664). Justice Kagan explained that, as in those cases, the DNA report was "made to establish some fact at a criminal proceeding" and "detail[ed] the results of forensic testing of evidence gathered by the police." Id. (internal citations omitted). Like the report in Bullcoming, the DNA report in Williams had "a comparable title; similarly describ[ed] the relevant samples, test methodology, and results; and likewise include[d] the signatures of laboratory officials." Id. On these facts alone, the dissent concluded that the report should have only come into evidence if Williams had the opportunity to cross examine the analyst. Id. But,

he did not have this opportunity, and thus could not question the appropriate analyst as to what he knew or observed during the testing, and did not have the opportunity to expose any lapses or shortcomings with the procedures.  Id. at 124.  In the dissent's view, "[u]nder our case law [these facts are] sufficient to resolve this case."  Id.

As to the plurality's second basis for finding the DNA report nontestimonial, the dissent, in tandem with Justice Thomas, rejected the proposition that in order to be testimonial, evidence must "be prepared for the primary purpose of accusing a targeted individual."  Id. at 135–37.  The dissent responded, "[w]here that test comes from is anyone's guess.  Justice Thomas rightly shows that it derives neither from the text nor the history of the Confrontation Clause . . . And it has no basis in our precedents."  Id. at 135 (internal citations omitted) ("None of our cases have ever suggested that, in addition, the statement must be meant to accuse a previously identified individual; indeed, in Melendez-Diaz, we rejected a related argument that laboratory 'analysts are not subject to confrontation because they are not 'accusatory' witnesses.'").  The dissent also rejected the plurality's attempt to re-introduce reliability as a tenet of whether a statement was testimonial.  Id. at 138 ("Dispensing with [cross examination] because testimony is obviously reliable is akin to dispensing with jury trial because a defendant is obviously guilty.").

Finally, in response to Justice Thomas's formality approach, the dissent found that the reports in Bullcoming, Melendez-Diaz, and Williams were all functionally similar, and that the similarities "dwarf[ed] the distinctions."  Id. at 139.  In each case, the report "[wa]s an official and signed record of laboratory test results, meant to establish a certain set of facts in a legal proceeding."  Id.  Because five justices rejected the plurality's proposed "identification" requirement of testimonial evidence, no single test was endorsed by a majority of the justices.

In response to this fractured opinion, lower courts have found that <u>Williams</u> does not alter the Court's Confrontation Clause jurisprudence, and should be limited to the set of facts in that case. <u>See</u>, <u>e.g.</u>, <u>United States v. James</u>, 712 F.3d 79 (2d Cir. 2013).

## 2. Second Circuit application of Supreme Court Confrontation Clause precedent

In <u>United States v. James</u>, with the benefit of all of the Supreme Court Confrontation Clauses cases discussed above, the Second Circuit carefully analyzed the effects of <u>Williams</u> on the Court's Confrontation Clause jurisprudence, and reviewed its own precedent in <u>United States v. Feliz</u>, 467 F.3d 227 (2d Cir. 2006), which had held that autopsy reports could be admitted as business records without violating the Confrontation Clause.  712 F.3d 79, 88 (2d Cir. 2013).

In <u>James</u>, the defendant argued that the district court erred in admitting testimony regarding an autopsy that the witness had not personally conducted, and in allowing a foreign medical examiner to testify to the results of a toxicology test that he had ordered but did not conduct.  <u>Id.</u> at 87.  The Second Circuit held that the autopsy report and toxicology report were not testimonial "because they were not created 'for the purpose of establishing or proving some fact at trial.'"  <u>Id.</u> at 88 (quoting <u>Melendez-Diaz</u>, 557 U.S. at 324).

In reviewing the Supreme Court's pre-<u>Williams</u> precedent, the Second Circuit distilled the guiding principle to be that "a laboratory analysis is testimonial if the circumstances under which the analysis was prepared, viewed objectively, establish that the primary purpose of a reasonable analyst in the declarant's position would have been to create a record for use at a later criminal trial."  <u>Id.</u> at 94.  The Second Circuit considered whether <u>Williams</u> changed that rule, but found that "[n]o single rationale disposing of the <u>Williams</u> case enjoys the support of a majority of the Justices."  <u>Id.</u> at 95.  Unable to discern a single controlling holding, the Second Circuit concluded

that it must "rely on Supreme Court precedent before <u>Williams</u> to the effect that a statement triggers the protections of the Confrontation Clause when it is made with the primary purpose of creating a record for use at a later criminal trial." <u>Id.</u> at 96.

Notably, because the defendants in <u>James</u> had not made a Confrontation Clause objection to the surrogate testimony concerning the OCME autopsy report at trial, the Second Circuit reviewed the Confrontation Clause challenge only for "plain error." <u>Id.</u> at 96.[5] The Second Circuit stated that it must "determine whether, under the circumstances, the autopsy report (including the toxicology report) was prepared with the primary purpose of creating a record for use at a later criminal trial." <u>Id.</u> at 97.

In its discussion of the facts, the court reviewed the relationship between OCME and law enforcement. <u>Id.</u> at 97–98. The court explained that OCME is independent, but that "the police are required to notify it when someone has died 'from criminal violence, by accident, by suicide, suddenly when in apparent health, when unattended by a physician, in a correctional facility or in any suspicious or unusual manner[.]'" <u>Id.</u> at 98 (quoting N.Y.C. Charter § 557(a), (f)(1)). Because the defendants did not object to the introduction of the surrogate testimony at trial, the court was left with a "scant record of the circumstances under which [the OCME analyst] produced her autopsy report." <u>Id.</u> Based on the limited record, the Second Circuit found that no one involved in the autopsy suspected foul play, nor anticipated that the autopsy report would be used at a criminal trial. <u>Id.</u> at 99. The autopsy report referred to the cause of death as

---

[5] Had the defendant preserved his Confrontation Clause challenge, the Second Circuit would have reviewed the issue for "harmlessness," "which requires [the Court] to ask whether [they] are satisfied 'upon a review of the entire record . . . beyond a reasonable doubt that the error complained of . . . did not contribute to the verdict obtained.'" <u>James</u>, 712 F.3d at 99 (citing <u>United States v. Lee</u>, 549 F.3d 84, 90 (2d Cir. 2008)).

"undetermined" and was conducted "substantially before any criminal investigation into [the] death had begun." Id. The Second Circuit held that "the autopsy report was not testimonial because it was not prepared primarily to create a record for use at a criminal trial." Id. On that basis, the court found no error in admitting the report into evidence or allowing a surrogate witness to testify to the report. Id.

The James defendants had objected at trial to the foreign medical examiner's testimony about forensic testing he had ordered but not conducted himself, thus adequately preserving their Confrontation Clause challenge. Id. The Second Circuit found the district court's basis for admitting the forensic testimony "of questionable validity" in light of the development of Supreme Court jurisprudence on the issue, but nevertheless held the evidence was properly admitted. Id. at 101. The Second Circuit reasoned that there was "no indication in [the foreign medical examiner's] testimony or elsewhere in the record that a criminal investigation was contemplated during the inquiry" and therefore found that the report was nontestimonial. Id.

Judge Eaton filed a separate concurrence, stating that "[b]ecause of the unsettled state of the law," he agreed that "the admission into evidence of the autopsy report prepared by [the OCME pathologist] did not constitute plain error," but disagreed with the majority's conclusion that the report was not testimonial. Id. at 108. Judge Eaton would have found that "the admission of any medical examiner's report prepared by OCME would trigger the protections in the Confrontation Clause" because "[a]ll such reports are made to establish facts about the cause of death of the decedent; they are made by and to government officials in a formalized recording; they contain statements a medical examiner could reasonably foresee would be used in a

criminal prosecution; and if a prosecutor seeks to introduce the report for its truth, it would substitute for live testimony adverse to the defendant." Id. at 111.

### C.      Application of Supreme Court Precedent

This Court follows the Second Circuit in James in largely relying on pre-Williams case law to guide its analysis of Garlick's Confrontation Clause claim. Id. at 95–96. In applying the pre-Williams principles to this case, the Court analyzes first the Trial Court's decision to allow the Autopsy Report into evidence at Garlick's trial, and then the First Department's affirmation of the Trial Court's decision.

### 1.      Introduction of the Autopsy Report at trial

Relying on People v. Freycinet, 11 N.Y.3d 38 (2008) and People v. Hall, 84 A.D.3d 79 (1st Dep't 2011), the Trial Court entered the Autopsy Report into evidence, and allowed Dr. Ely to testify about the Autopsy Report as an expert. (See supra § II.B.2).

In allowing Dr. Ely to testify to the Autopsy Report over Garlick's Confrontation Clause objection, the Trial Court rejected defense counsel's interpretation of Freycinet, and noted that, "more recently in People against Hall . . . similar issues were before the court and it was held that it was proper to allow a witness to testify to the contents of an autopsy report, even though the witness had not participated in the autopsy." (ECF No. 13 at 21–22). During Dr. Ely's testimony, when defense counsel repeated the Confrontation Clause objection, the State asserted that "[t]he autopsy report is admissible as a business record. Once it's admissible, I can call any expert witness, whether they're connected with the medical examiner's office or not, so long as they're an expert to interpret it." (Id. at 32). The Trial Court agreed, and, citing Hall, allowed the Autopsy Report and the surrogate testimony. (Id. at 32–34). Thereafter, the Trial Court allowed Dr. Ely

to testify to both the factual findings and the opinions in the Autopsy Report.  (ECF No. 13-1 at 1–13).  Dr. Ely essentially read the Autopsy Report into evidence, recounting what Dr. Maloney observed from Sherwood's body (ECF No. 13-1 at 1), noting the age Dr. Maloney believed Sherwood to be (id. at 2), describing the differences between the different types of wounds that Dr. Maloney had identified (id. at 2–3), and opining as to which injuries contributed to Sherwood's death (id. at 3 ("[Sherwood] also had some blunt force trauma to his face.  That's a different kind of injury which I can describe in a moment and was not part of his cause of death ultimately."), 13 ("The cause of death is stab wound of torso with preformation of heart.")).

As discussed further below, this Court concludes that the Autopsy Report was testimonial, and thus its introduction into evidence without providing Garlick an opportunity to cross examine the pathologist who performed the autopsy violated the Confrontation Clause.

### a) The Autopsy Report is testimonial under Supreme Court precedent

As set forth above (supra §§ III.B.1.b–d), pre-Williams Supreme Court precedent endorsed the following formulations of testimonial statements:

1. "A solemn declaration or affirmation made for the purposes of establishing or proving some fact."[6]

2. "[E]x parte in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially."[7]

---

[6] Crawford, 541 U.S. at 52 (citing 2 N. Webster, Am. Dictionary of the English Language (1828)); Bullcoming, 564 U.S. at 652 ("The question presented is whether the Confrontation Clause permits the prosecution to introduce a forensic laboratory report containing a testimonial certification—made for the purposes of proving a particular fact—through the in-court testimony of a [surrogate witness].").

[7] Crawford, 541 U.S. at 52; Melendez-Diaz, 557 U.S. at 310 (quoting Crawford, 541 U.S. at 51–52) (also formulating testimonial statements as "contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions"); Bullcoming, 564 U.S. at 664–65 ("[T]he formalities attending the 'report of blood alcohol analysis' are more than adequate to qualify [the analyst's] assertions as testimonial. The absence of notarization does not remove his certification from Confrontation Clause governance."); Bullcoming, 564 U.S. at 671 (Sotomayor,

3.      "[S]tatements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial."[8]

4.      Statements that have "a primary purpose of creating an out-of-court substitute for trial testimony."[9]

Under each of these formulations, the Autopsy Report qualifies as a testimonial statement.

### (i)      Solemn declaration or affirmation

The Autopsy Report is "[a] solemn declaration or affirmation made for the purposes of establishing or proving some fact."  Crawford, 541 U.S. at 52.  According to Supreme Court precedent, a document need not be notarized to be testimonial.  Bullcoming, 564 U.S. at 664–65 ("[T]he formalities attending the 'report of blood alcohol analysis' are more than adequate to qualify [the analyst's] assertions as testimonial.  The absence of notarization does not remove his certification from Confrontation Clause governance."); id. at 671 (Sotomayor, J., concurring) ("I agree with the Court's assessment that the certificate at issue here is a formal statement, despite the absence of notarization.").  In its discussion of requisite formalities of testimonial evidence in Bullcoming, the Court considered that the report there, as in Melendez-Diaz, was sufficiently formal because in both cases, a law-enforcement officer provided seized evidence (white powder and blood, respectively) to a state laboratory required by law to assist in police investigation;

---

J., concurring) ("I agree with the Court's assessment that the certificate at issue here is a formal statement, despite the absence of notarization.").

[8] Crawford, 541 U.S. at 52; Melendez-Diaz, 557 U.S. at 310 (quoting Crawford, 541 U.S. at 51–52); Bullcoming, 564 U.S. at 664 ("A document created solely for an 'evidentiary purpose,' Melendez-Diaz clarified, made in aid of a police investigation, ranks as testimonial.").

[9] Bullcoming, 564 U.S. at 670 (Sotomayor, J., concurring) (quoting Bryant, 562 U.S. at 358) ("[T]he BAC report and [the analyst's] certification on it clearly have a 'primary purpose of creating an out-of-court substitute for trial testimony.'").

both analysts tested the evidence and prepared a certificate containing the result of the analysis; and, both certificates were "formalized" in a signed document labeled "report." Id. at 665.

All of these factors are met here.  After Detective DeGrazia communicated with OCME, the state agency charged with assisting police in cases of unusual death, Sherwood's body was transported to OCME for an autopsy.  (ECF No. 13 at 24; ECF No. 4 at 8).  Then, the OCME pathologist (Dr. Maloney) conducted the autopsy, prepared a certificate containing the results of the procedure, and formalized the process and conclusions in a signed document labeled "Report."  (ECF No. 11-7).  Thus, the Autopsy Report is testimonial under the first formulation.

### (ii)    Functional equivalent of ex parte in-court testimony

The second formulation is whether the Autopsy Report is "ex parte in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially." Crawford, 541 U.S. at 51.  Here, the Autopsy Report is the functional equivalent of in-court testimony, and the Court finds that a reasonable pathologist in the same situation would expect the findings could be used prosecutorially.  Like the reports in Palmer v. Hoffman, where the Supreme Court held that railroad company accident reports, even though kept in the regular course of business, were not admissible without confrontation because they were "calculated for use essentially in the court, not in the business," so too are autopsy reports.  318 U.S. at 114.  OCME regularly conducts autopsies, (see ECF No. 13 at 24 (Dr. Ely testifying that the OMCE performs "thousands" of autopsies a year)), and even though not all autopsy reports will be used in litigation, it is a distinct

possibility, and one of which a pathologist would be aware.[10]   In New York City, OCME conducts

autopsies in suspicious cases or in cases of suspected homicide.  See N.Y. County Law § 673(a)

("A coroner or medical examiner has jurisdiction and authority to investigate the death of every

person dying within his county, or whose body is found within the county, which is or appears to

be:   A violent death, whether by criminal violence, suicide or casualty).   By statute, the facts

contained in autopsy reports created by OCME are considered "prima facie" evidence of the facts

they state.  See N.Y. C.P.L.R. § 4520 ("Where a public officer is required or authorized, by special

provision of law, to make a certificate or affidavit to a fact ascertained, or an act performed, by

him in the course of his official duty, and to file or deposit it in a public office of the state, the

certificate or affidavit so filed or deposited is prima facie evidence of the facts stated."); N.Y. Pub.

Health Law § 4103(3) ("A certified copy of the record of a birth or death, a certification of birth

or death, a transcript of a birth or death certificate, a certificate of birth data or a certificate of

registration of birth, when properly certified by the commissioner or persons authorized to act

for him, shall be prima facie evidence in all courts and places of the facts there in stated.").

In addition, several circuit courts and highest state appellate courts have held that

autopsy reports are testimonial in all, or certain, circumstances.  See United States v. Ignasiak,

667 F.3d 1217 (11th Cir. 2012) (holding that in light of the medical examiner's duty to assist the

police, autopsy reports were testimonial, even though not all would be used in criminal trials);

United States v. Moore, 651 F.3d 30 (D.C. Cir. 2011) (finding an autopsy report testimonial when

---

[10]See James, 712 F.3d at 111 (Eaton, J., concurring) (noting that he would have found "the admission of any medical examiner's report prepared by OCME would trigger the protections in the Confrontation Clause" because "[a]ll such reports are made to establish facts about the cause of death of the decedent; they are made by and to government officials in a formalized recording; they contain statements a medical examiner could reasonably foresee would be used in a criminal prosecution; and if a prosecutor seeks to introduce the report for its truth, it would substitute for live testimony adverse to the defendant.").

the autopsy had been conducted in the presence of law enforcement officers, and when the findings were formalized in documents titled "reports"); <u>State v. Kennedy</u>, 735 S.E.2d 905 (W. Va. 2012) (holding that for purpose of use in criminal prosecutions, autopsy reports are, under all circumstances, testimonial hearsay under the Confrontation Clause); <u>Wood v. State</u>, 299 S.W.3d 200 (Tex. Ct. App. 2009) (finding autopsy reports testimonial when the nature of death was suspect and a police officer attended the autopsy, because it was reasonable to believe that the medical examiner would assume the report and her opinions would be used prosecutorially).

In <u>Melendez-Diaz</u>, the forensic analysis established that the seized substance was cocaine, in <u>Bullcoming</u>, the blood-alcohol report established the impermissibly high blood-alcohol level, and here, the Autopsy Report established Sherwood's cause of death.  <u>Melendez-Diaz</u>, 557 U.S. at 308; <u>Bullcoming</u>, 564 U.S. at 651.  All three reports "are functionally identical to live, in-court testimony, doing precisely what a witness does on direct examination."  <u>Melendez-Diaz</u>, 557 U.S. at 310–11 (internal citations omitted); <u>see</u> <u>Bullcoming</u>, 564 U.S. at 656 (quoting <u>Melendez-Diaz</u>, 557 U.S. at 310–11).  If called to testify, Dr. Maloney, the pathologist who prepared the Autopsy Report in this case, would likely have testified as to the report's conclusion as to Sherwood's cause of death, and what the wounds revealed, if anything, as to Garlick's motive or the type of weapon used.  Therefore, the Autopsy Report is testimonial under the second formulation.

### (iii)    Objective witness standard

Under the third formulation, the Autopsy Report is testimonial because it contains "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial."  <u>Crawford</u>, 541 U.S. at 52; <u>Melendez-Diaz</u>, 557 U.S. at 310; <u>Bullcoming</u>, 564 U.S. at 664.  Several facts in this

case illustrate that a pathologist in the same situation as Dr. Maloney in this case would have reasonably believed that her report would be used at a later criminal trial.  First, Detective DeGrazia spoke with OCME, which thereafter prepared a "Supplemental Case Information" sheet noting that the victim had multiple stab wounds.  (ECF No. 4 at 8, ECF No. 11-7 at 17).  Second, before the autopsy, OCME prepared a "Notice of Death" form, which stated:  "Circumstances of death: App[arent] manner: Homicide."  (ECF No. 11-7 at 18).  Third, two homicide detectives, Detectives Speranza and Farmer, were present during the autopsy.  (Id. at 21, ECF No. 13-6 at 25).  Finally, the "Case Worksheet," prepared at the same time as the Autopsy Report, repeated the finding as to the cause of death as "stab wound of torso with perforation of heart."  (ECF No. 11-7 at 13).  A reasonable pathologist conducting an autopsy under these circumstances should have reasonably believed that a criminal investigation was underway, and that the subsequent autopsy report would very likely be used in that criminal investigation.  See James, 467 F.3d at 111 (Eaton, J., concurring) (noting that he would find all OCME autopsy reports testimonial because "they contain statements a medical examiner could reasonably foresee would be used in a criminal prosecution").

### (iv)    Primary purpose

The Autopsy Report is also testimonial under the "primary purpose" formulation discussed in Bryant and Justice Sotomayor's concurrence in Bullcoming—whether the statement has "'a primary purpose of creating an out-of-court substitute for trial testimony.'"  Bullcoming, 564 U.S. at 669 (quoting Bryant, 562 U.S. at 358).  As discussed above, the Autopsy Report itself constitutes an out-of-court substitute for trial testimony, in that it contains the same information that Dr. Maloney would have testified to had she been called as a witness.

In considering the primary purpose of a statement, several Justices have pointed to the formalities of the document at issue.  Bullcoming, 564 U.S. at 671 (while "'[f]ormality is not the sole touchstone of our primary purpose inquiry,' a statement's formality or informality can shed light on whether a particular statement has a primary purpose of use at trial") (quoting Bryant, 562 U.S. at 366).  Here, the document, titled "Report of Autopsy," certified that Dr. Maloney performed the autopsy of Gabriel Sherwood on November 2, 2011, and is affixed with the seal of the City of New York.  (ECF No. 11-7 at 3).  The Autopsy Report indicates that the final version was sent to the Bronx District Attorney's Office on December 30, 2011 and was signed by Dr. Maloney in three places.  (Id. at 1, 8, 10, 14).  Just as the report in Melendez-Diaz had the primary purpose of establishing the contents of the seized substance, and the report in Bullcoming had the primary purpose of determining blood-alcohol level, here, the Autopsy Report had the primary purpose of establishing Sherwood's cause of death.  See Bullcoming, 564 U.S. at 670 (discussing why the reports in Melendez-Diaz and Bullcoming had the "primary purpose of creating an out-of-court substitute for trial testimony").  Thus, the Autopsy Report is testimonial under the "primary purpose" analysis.

### (v)  The Autopsy Report is testimonial under James and Williams

In James, the Second Circuit distilled from the Supreme Court's pre-Williams case law the principle that "a laboratory analysis is testimonial if the circumstances under which the analysis was prepared, viewed objectively, establish that the primary purpose of a reasonable analyst in the declarant's position would have been to create a record for use at a later criminal trial." James, 712 F.3d at 94.  As noted above, the circumstances surrounding the Autopsy Report

indicate that Dr. Maloney reasonably should have been aware of the pending criminal investigation into Sherwood's death.  (See supra §§ II.A.2, III.C.1.a.iii).

Although the Second Circuit in James concluded that the autopsy report before it was not testimonial, this case differs in several important respects.  In James, first of all, the court was applying only plain error review because the Confrontation Clause objection had not been preserved, unlike in this case, where it is undisputed that defense counsel preserved the issue. (See ECF No. 11-2 at 42 (State's First Dep't Brief) ("During voir dire, defense counsel argued that the autopsy report was testimonial and that, therefore, allowing a medical examiner who did not conduct the autopsy to testify at trial about the contents of the report would violate defendant's confrontation right.").  As a result, from the "scant record of the circumstances" under which the autopsy report was produced, the Second Circuit found no suggestion anyone suspected foul play or suspected that a criminal investigation might ensue.  James, 712 F.3d at 98–99.  The report in James also stated the cause of death as "undetermined" and the autopsy was conducted before any criminal investigation had begun.  Id.  In contrast, here there is a thorough record of the circumstances under which Sherwood's autopsy was conducted, and that record contains multiple indications of an on-going criminal investigation into a potential homicide.  (See supra §§ II.A.1–2).

In addition, this Court agrees with Judge Eaton's concurrence in James that "the admission of any medical examiner's report prepared by OCME would trigger the protections in the Confrontation Clause" because "[a]ll such reports are made to establish facts about the cause of death of the decedent; they are made by and to government officials in a formalized recording; they contain statements a medical examiner could reasonably foresee would be used in a

criminal prosecution; and if a prosecutor seeks to introduce the report for its truth, it would substitute for live testimony adverse to the defendant." James, 712 F.3d at 111.

Finally, even under the plurality's formulation in Williams, the Autopsy Report is testimonial because it was "inherently inculpatory." 567 U.S. at 58. At the time of Sherwood's autopsy, the police had issued an I-Card for Garlick's arrest. (ECF No. 13-5 at 5) (discussing that at 4:45 a.m. on November 2, 2011, Detective DeGrazia issued an I-card to arrest Garlick for his involvement in the apparent homicide). The Autopsy Report is also inculpatory because it clarified the cause of death as a stab wound, not head trauma, thus incriminated Garlick and exculpated Johanna Rivera. (ECF No. 11-7 at 3). The Autopsy Report was "prepared for the primary purpose of accusing a targeted individual," and is therefore testimonial. Williams, 567 U.S. at 82–86; but see Griffin, 876 F.3d at 409 (discussing Williams, and noting that "both Justice Thomas in his concurrence and Justice Kagan in her dissent specifically reject the proposition that Confrontation Clause protections should be limited to circumstances in which a suspect has been identified").

Accordingly, under any of the five formulations of "testimonial," the Autopsy Report qualifies as testimonial and should not have been admitted into evidence at trial without giving Garlick the opportunity to cross examine Dr. Maloney, the pathologist who conducted the autopsy. Crawford, 541 U.S. at 52, 61 ("[T]he Confrontation Clause applies to 'witnesses' against the accused—in other words, those who 'bear testimony'" and "commands . . .that reliability be assessed in a particular manner: by testing in the crucible of cross-examination.").

**b) Surrogate expert testimony does not satisfy the Confrontation Clause**

Because the Autopsy Report is testimonial, surrogate testimony, even by an expert, was not a constitutionally sufficient substitute for the cross examination of Dr. Maloney herself.  In Bullcoming, the New Mexico Supreme Court had approved the admission of surrogate testimony about the DNA report because the witness "qualified as an expert witness with respect to the gas chromatograph machine and the . . . laboratory procedures."   Bullcoming, 564 U.S. at 661 (internal citations omitted).  The Supreme Court rejected this justification, stating that surrogate testimony "could not convey what [the analyst conducting the test] knew or observed about the events his certification concerned, i.e., the particular test and testing process he employed."   Id. Further, surrogate testimony could not "expose any lapses or lies on the certifying analyst's part." Id. at 662.  As emphasized in Crawford,

> "[t]he text of the Sixth Amendment does not suggest any open-ended exceptions from the confrontation requirement to be developed by the courts." . . . Accordingly, the Clause does not tolerate dispensing with confrontation simply because the court believes that questioning one witness about another's testimonial statements provides a fair enough opportunity for cross-examination.

Id. (quoting Crawford, 541 U.S. at 54).  Just as in Bullcoming, Dr. Ely's surrogate testimony regarding the Autopsy Report could not convey which tests were used, why those tests were employed, and whether there were any potential lapses in the autopsy process.

In addition, Williams may suggest that when the underlying testimonial statement is not being offered for its truth, but rather as the evidence on which the expert testimony is based, no Confrontation Clause issue exists.  567 U.S. at 58.  In Williams, however, the plurality relied on the fact that the case involved a bench trial and speculated that a jury would be less able to discern between evidence admitted for its truth and evidence admitted to explain the basis of

the expert's opinion.  Id. at 70.  Here, the Autopsy Report was offered for its truth—in fact, the prosecutor argued, "[t]he autopsy report is admissible as a business record.  Once it's admissible, I can call any expert witness, whether they're connected with the medical examiner's office or not, so long as they're an expert to interpret it."  (ECF No. 13 at 32).  Contrary to the prosecutor's argument, however, as the Supreme Court established, when the business records are regularly used as evidence for trial, an expert's interpretation does not satisfy the Confrontation Clause. Melendez-Diaz, 557 U.S. at 321 ("Documents kept in the regular course of business may ordinarily be admitted at trial despite their hearsay status.  But that is not the case if the regularly conducted business activity is the production of evidence for use at trial.") (internal citations omitted); Bullcoming, 564 U.S. at 661; Crawford, 541 U.S. at 54.  Accordingly, the Trial Court should not have permitted Dr. Ely to testify to the contents of the Autopsy Report, even as an expert.

### c)     The cases on which the state courts relied do not reflect current Supreme Court Confrontation Clause precedent

In allowing Dr. Ely to testify to the Autopsy Report at trial, the Trial Court relied on People v. Freycinet, 11 N.Y.3d 38 (2008) and People v. Hall, 84 A.D.3d 79 (1st Dep't 2011).  On close review, however, these cases do not reflect current Supreme Court Confrontation Clause precedent.

People v. Freycinet was decided on June 26, 2008, after Crawford, but before Melendez-Diaz and Bullcoming.  11 N.Y.3d 38 (2008).  In that case, the defendant's girlfriend died of a knife wound, and the defendant was indicted for murder, among other crimes.  Id. at 39.  As in the current case, a pathologist with OCME performed the autopsy and prepared a report with his findings.  Id. at 40.  Although the pathologist who performed the autopsy did not testify at trial,

the report was entered into evidence, over the defendant's objection.  Id.  Notably, the report

had been "redacted to eliminate [the pathologist's] opinions as to the cause and manner of the

victim's death[.]"  Id.  The court permitted surrogate testimony of another OCME pathologist as

an expert, who in theory was only providing her own opinions based on the underlying facts in

the autopsy report.  Id.  After a bench trial, the trial judge acquitted the defendant of murder,

but convicted him of manslaughter in the second degree.  Id.

On appeal, both the Appellate Division and the Court of Appeals affirmed the conviction,

finding no Confrontation Clause violation.  Id.  The Court of Appeals stated that the question

presented was "whether the redacted version of [the pathologist's] autopsy report was

'testimony' as that term is used in Crawford."  Id. at 41.  The court considered several factors

outlined in People v. Rawlins, 10 N.Y.3d 136,153–56 (2008):  (1) "the extent to which the entity

conducting the procedure is an arm of law enforcement;" (2) "whether the contents of the report

are a contemporaneous record of objective fact, or reflect the exercise of fallible human

judgment;" (3) "whether a pro-law-enforcement bias is likely to influence the contents of the

report;" and (4) "whether the report's contents are directly accusatory in the sense that they

explicitly link the defendant to the crime."  Id. (internal citations omitted).  Considering these

factors, the Freycinet court found that the autopsy report was not testimonial because OCME

was an independent agency, the report was redacted to eliminate opinions, the report was a

contemporaneous record of objective facts, and the report was unlikely to have been affected

by pro-law-enforcement bias.  Id. at 42.  Finally, the court concluded that the report was not

testimonial because "it did not directly link defendant to the crime."  Id.  As discussed further

below, Supreme Court precedent does not support using these factors.

The first Freycinet factor—the extent to which the entity conducting the procedure is an arm of law enforcement—is not found in Supreme Court precedent.  The integral role OCME plays in police investigations suggests that its employees are aware that their reports and findings may be used in future criminal prosecutions.  (See supra § III.C.1.a.iii).

The second and third factors—whether the contents of the report are a contemporaneous record of objective fact, or reflect the exercise of fallible human judgment, and whether a pro-law-enforcement bias is likely to influence the contents of the report, respectively—consider the reliability of statements, but the Supreme Court in Crawford and Melendez-Diaz soundly rejected the reliability formulation of testimonial statements.  (See supra §§ III.B.1.b–c).

The final Freycinet factor, whether statements are "directly accusatory," also refers to a concept the Supreme Court has rejected.  Melendez-Diaz explicitly found that evidence need not identify a specific individual or be "directly accusatory" to be considered testimonial.  557 U.S. at 313 (stating that the identification requirement "finds no support in the text of the Sixth Amendment or our case law.").  Accordingly, in relying on Freycinet, the Trial Court did not apply the Supreme Court's modern Confrontation Clause precedent.

The Trial Court also relied on People v. Hall, 84 A.D.3d 79 (1st Dep't 2011).  (ECF No. 13 at 22).  The defendant in Hall appealed his murder conviction, asserting that "the admission of an unredacted autopsy report violated his right under the Confrontation Clause."  Hall, 84 A.D. at 81.  At the trial in Hall, an OCME pathologist testified as an expert to the autopsy report performed by another OCME pathologist.  Id. at 82.  The First Department, following Freycinet, found that the "factual part of the autopsy report is nontestimonial and thus admissible, and, in

this case, <u>Melendez-Diaz</u> does not mandate a contrary result."  <u>Id.</u>  The First Department then

discussed the <u>Freycinet</u> factors in the context of <u>Melendez-Diaz</u>, reasoning that because

"<u>Melendez-Diaz</u> did not explicitly hold that autopsy reports are testimonial . . . the Court of

Appeals' decision in <u>Freycinet </u>is directly on point as applicable to this case."  <u>Id.</u>  The First

Department explained that the holding in <u>Melendez-Diaz</u> could be arguably limited to the

"formalized testimonial materials" that Justice Thomas discussed, and because "here, the

autopsy report, which was unsworn, cannot fairly be viewed as formalized testimonial material."

<u>Id.</u> at 83 (internal citation omitted).  The Supreme Court's decision in <u>Bullcoming</u>, however,

directly addressed the issues of notarization and surrogate testimony through an expert, and

unequivocally stated that a document need not be notarized to be testimonial, and that

surrogate expert testimony does not satisfy the Confrontation Clause.  <u>Bullcoming</u>, 564 U.S. at

66264.  Therefore, by relying on <u>Hall,</u> the Trial Court was also not applying the most recent

Supreme Court precedent.

### 2.      The First Department's decision

On appeal to the First Department, Garlick argued that the introduction of the Autopsy

Report through surrogate testimony violated his Confrontation Clause rights.  (ECF No. 11-1 at

49).  The First Department held:

> "Defendant's right of confrontation was not violated when an autopsy
> report prepared by a former medical examiner, who did not testify, was
> introduced through the testimony of another medical examiner" (<u>People
> v. Acevedo</u>, 112 AD3d 454, 455 [1st Dept 2013], <u>lv denied</u> 23 N.Y.3d 1017
> [2014], since the report, which "[did] not link the commission of the
> crime to a particular person," was not testimonial (<u>People v. John</u>, 27
> NY3d 294, 315 [2016]).  Defendant's contention that <u>People v. Freycinet</u>
> (11 NY3d 38 [2008] has been undermined by subsequent decisions of the
> United States Supreme Court is unavailing (<u>see Acevedo</u>, 112 AD3d at
> 455).

Garlick, 144 A.D.3d at 606.  Because the First Department's discussion of this issue relied heavily on People v. Acevedo, and People v. John in addition to Freycinet, in reviewing whether the First Department's decision was contrary to or an unreasonable application of clearly established law, this Court now considers how those cases interpreted and applied Supreme Court precedent.

### a)      People v. Acevedo

The First Department cited People v. Acevedo, 112 A.D. 3d 454 (1st Dep't 2013) for the propositions that Garlick's Confrontation Clause right was not violated when Dr. Ely was allowed to testify to the Autopsy Report Dr. Maloney prepared, and that Freycinet was still good law. (See supra § II.B.3).  The First Department's reliance on this case is questionable, however, because Acevedo did not correctly apply Supreme Court precedent, and does not support the propositions for which the First Department cited it.

In Acevedo, the First Department held that the defendant's Confrontation Clause rights were not violated when a medical examiner was permitted to testify to an autopsy report that he did not conduct, and upheld Acevedo's jury conviction for murder.  112 A.D. 3d at 454.  In its opinion, the First Department concluded, without discussion, that surrogate testimony by a medical examiner who did not perform the autopsy report at issue was not a confrontation clause violation.  The court summarily stated, "[t]he report was not testimonial," citing Freycinet and Hall, and added, "neither Bullcoming v. New Mexico nor any other decision of the Supreme Court of the United States is contrary," citing pages 87 and 88 of the Second Circuit's opinion in James. Id. at 455.

As explained above, at the time of the trial in Acevedo, and on review by the First Department in this case, Freycinet propounded a test that did not reflect Supreme Court

precedent.  (See supra § III.C.1.c).  Thus, the First Department's reliance on those cases for the proposition that Acevedo's right of confrontation was not violated by surrogate testimony was not consistent with Supreme Court precedent.

In addition, the First Department's citation to pages 87 and 88 of James does not support the proposition that Freycinet is consistent with Supreme Court precedent.  Id.  On page 87 of the James opinion, the Second Circuit outlines the facts of the case and begins the discussion of the Confrontation Clause issue, 712 F.3d at 87, and on the beginning of page 88, the Second Circuit summarizes its analysis, finding that "the autopsy reports in this case are nevertheless not testimonial—and therefore do not implicate the Confrontation Clause—because they were not created 'for the purpose of establishing or proving some fact at trial,'" id. at 88 (quoting Melendez-Diaz, 557 U.S. at 324).  These pages reflect the Second Circuit's use of the "primary purpose" test when confronted with the question of whether an autopsy report is testimonial, but the First Department did not actually apply the primary purpose analysis to the facts in Acevedo.  Thus, the conclusion it reached, that Acevedo's Confrontation Clause rights were not violated by surrogate testimony, is not supported by James.

Just as the First Department did not engage in the primary purpose analysis in Acevedo, it also did not do so in its review of the Trial Court's decision in this case.  Here, the First Department did not consider the primary purpose of the Autopsy Report; if it had, it would have been compelled to find that the Autopsy Report was testimonial, as it had the primary purpose of serving as evidence in a homicide investigation and trial.  (See supra §§ II.A.2, III.C.1.a).  Just as the primary purpose of a road-side blood-alcohol test is not to determine a driver's blood alcohol level in isolation, but rather is primarily used to determine whether the blood-alcohol level is

above the legal limit, so too, here, the primary purpose of the autopsy was not to determine the cause of death in a vacuum, but was primarily used to determine whether the death was a homicide, which naturally would lead to a criminal action.  See Bullcoming, 564 U.S. at 668.

Accordingly, the First Department's reliance on Acevedo for the propositions that Garlick's Confrontation Clause right was not violated when Dr. Ely was allowed to testify to the Autopsy Report prepared by Dr. Maloney, and that Freycinet was still good law, are unsupported and do not reflect modern Confrontation Clause principles endorsed by the Supreme Court.

### b) People v. John

The First Department also relied on People v. John, 27 N.Y.3d 294, 315 (2016), for the proposition that the Autopsy Report was not testimonial because it did not link the crime to a particular person.  Garlick, 144 A.D. 3d at 606.  Setting aside the fact that the Autopsy Report did link Garlick to the crime (see supra § III.C.1.a.), the Supreme Court has rejected this formulation of testimonial evidence.  (See supra §§ III.B.1.b–d).  Further, the First Department did not engage in the analysis discussed in John, which found that a DNA report was testimonial and that the facts "fit into even the narrow primary purpose test articulated by the Williams plurality," while also noting the "continued viability of the Bullcoming and Melendez-Diaz decisions[.]"  John, 27 N.Y.3d at 308, 311.

John also cited James for the "link-to-a-particular-person" standard.  Id. at 315.  In James, as discussed above, however, the Second Circuit rejected that standard.  James, 712 F.3d at 95 ("Nor do we think we can apply the [ ] narrowed definition of testimonial," proposed by the plurality decision in Williams, "which would require that the analyst had 'the primary purpose of accusing a targeted individual of engaging in criminal conduct[.]'").  (See supra §§ III.B.1.e, III.B.2).

The John court found that, even under Williams, the facts of the case established that the DNA report was testimonial because there was a criminal action pending against the defendant at the time the report was prepared, the primary purpose of the DNA evidence was to establish a fact in a criminal trial—that the defendant possessed the gun—and the OCME laboratory reports noted that the police requested the test because "the 'perp' handled the gun." John, 27 N.Y.3d at 307–08.  Similarly, in this case, police had already identified Garlick as a suspect and were seeking his arrest, the primary purpose of the autopsy report was to establish Sherwood's cause of death, and communications between OCME and the police indicated that this autopsy was to be conducted as part of a homicide investigation.  (See supra §§ II.A.1–2, III.C.1.a.iv).

Finally, the First Department cited to page 315 of John to support its proposition that a link to a particular defendant is required, but that page discussed which analysts should testify, redactions of autopsy reports, and began the dissent authored by Judge Garcia.  Id. at 315. Nowhere does it support the conclusion that the Autopsy Report was not testimonial because it did not link Garlick to the crime.  Thus, the analysis in John actually supports the conclusion that the Autopsy Report was testimonial, the opposite of the First Department's decision here.

### 3.        The impact of the scope of habeas review

Because the First Department adjudicated Garlick's Confrontation Clause objection on its merits, this Court may grant a writ of habeas corpus only if the state adjudication resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.  (See supra § III.A.2).

As set forth above, this Court has concluded that the cases on which the Trial Court and the First Department relied do not reflect current Supreme Court Confrontation Clause precedent.  (Supra §§ III.C.1–2).  As this Court has explained, under any formulation provided by the Supreme Court, including Williams, the Autopsy Report is testimonial.  (See supra § III.C.1.a).  Nevertheless, this Court is constrained by the requirement that the Supreme Court's precedent be "clearly established," 22 U.S.C. § 2254(d)(1), and must consider, for purposes of habeas review, whether this line of precedent was "clearly established" at the time of the First Department's decision.

In considering whether the Supreme Court's Confrontation Clause precedent was "clearly established," this Court has considered how other federal district and circuit courts have interpreted the law in connection with autopsy reports.  While many courts have found autopsy

reports testimonial on direct review,[11] others have found the opposite.[12]  There are few cases that review this issue in the highly deferential habeas context,[13] and even fewer have reviewed this issue in the habeas context after Williams.[14]

---

[11]See United States v. Ignasiak, 667 F.3d 1217 (11th Cir. 2012) (holding that in light of the medical examiner's duty to assist the police, autopsy reports were testimonial, even though not all would be used in criminal trials); United States v. Moore, 651 F.3d 30 (D.C. Cir. 2011) (finding an autopsy report testimonial when the autopsy had been conducted in the presence of law enforcement officers, and when the findings were formalized in documents titled "reports"); State v. Bass, 132 A.3d 1207 (N.J. 2016) (finding an autopsy report testimonial where the police were engaged in an active homicide investigation and had a suspect, and the autopsy was conducted in the presence of two law enforcement officers, even when the report was not entered into evidence); Rosario v. State, 175 So.3d 843 (Fl. App. 2015) (holding that an autopsy report created during a homicide investigation and asserting that the cause of death was homicide was testimonial); Commonwealth v. Carr, 986 N.E.2d 380, 389–400 (2013) (finding that a death certificate created during a homicide investigation that stated the cause of death was a "gunshot wound of the head with fracture of skull and perforation of the brain" was testimonial) (abrogated on other grounds by Commonwealth v. Crayton, 21 N.E. 3d 157 (2014)); Miller v. State, 313 P.3d 934, 967–70 (Okla. Crim. App. 2013) (finding an autopsy report testimonial and surrogate testimony a Confrontation Clause violation "because the current state of the law so clearly established that it violated the Confrontation Clause to allow [the surrogate witness'] to give voice to the analysis, findings and conclusions [in the autopsy report]."); State v. Navarette, 294 P.3d 435, 440–42 (N.M. 2013) (finding an autopsy report testimonial and surrogate testimonial a Confrontation Clause violation when the autopsy report contained statements "made with the primary intention of establishing facts that the declarant understood might be used in a criminal prosecution and where the statements in the report were relayed to the jury as the basis for the pathologist's opinions"); State v. Kennedy, 735 S.E.2d 905 (W. Va. 2012) (holding that for purpose of use in criminal prosecutions, autopsy reports are, under all circumstances, testimonial hearsay under the Confrontation Clause); Wood v. State, 299 S.W.3d 200 (Tex. Ct. App. 2009) (finding autopsy reports testimonial when the nature of death was suspect and a police officer attended the autopsy, because it was reasonable to believe that the medical examiner would assume the report and her opinions would be used prosecutorially); State v. Locklear, 681 S.E.2d 293 (N.C. 2009) (finding autopsy reports to be the "type of forensic report discussed in Crawford").

[12]Ackerman v. State, 51 N.E.3d 171 (Ind. 2016) (finding autopsy report nontestimonial when there was no evidence linking the defendant to the death at the time of the autopsy); State v. Medina, 306 P.3d 48 (Ariz. 2013) (finding an autopsy report not testimonial after considering "the primary purpose that a reasonable person would have ascribed to the statement, taking into account all of the surrounding circumstances."); People v. Leach, 980 N.E.2d 570 (Ill. 2012) (finding an autopsy report not testimonial because it was not prepared for the primary purpose of accusing a targeted individual or for the primary purpose of providing evidence in a criminal trial).

[13] McCarley v. Kelly, 801 F.3d 652, 664–65 (6th Cir. 2015) (finding the state of the Supreme Court's law to be clearly established after Crawford and Davis); Vega v. Walsh, 669 F.3d 123 (2d Cir. 2012) (finding the date of the law as of 2005 unclear); Portes v. Capra, No. 16 Civ. 6294 (LDH), 2018 WL 4288627 (E.D.N.Y. Sept. 7, 2018) (finding an autopsy report nontestimonial by relying on the Freycinet factors and relying on Vega, which only considered the state of the law after Crawford); Soler v. United States, No. 15 Civ. 4342 (LAP), 2015 WL 4879170 (S.D.N.Y. Aug. 14, 2015) (finding the law at the time of the trial in 2007 to be unsettled and discussing that the subsequent case law  has not developed a clear set of rules on this point).

[14] Hensley v. Roden, 755 F.3d 724 (1st Cir. 2014) (finding the state of confrontation clause precedent uncertain, and rejecting the habeas petitioner's claim that the testimonial nature of autopsy reports was clearly established).

As the Second Circuit stated in <u>Griffin</u> when faced with the question whether Supreme Court precedent was clearly established, "[a] state court cannot be faulted for declining to apply a specific legal rule 'that has not been squarely established by [the Supreme] Court', nor even for incorrectly applying an established rule where reasonable jurists could disagree as to its application." <u>Griffin</u>, 876 F.3d at 407 (citing <u>Harrington v. Richter</u>, 562 U.S. 86, 101 (2009)); <u>White v. Woodall</u>, 572 U.S. 415, 426–27 (2014); <u>see</u> <u>Jimenez v. Walker</u>, 458 F.3d 130, 147 (2d Cir. 2006) ("[W]e must conclude not only that the trial court's [action] was unconstitutional but that it was so plainly unconstitutional that it was objectively unreasonable for the Appellate Division to conclude otherwise.").

This Court also recognizes Judge Eaton's concurrence in <u>James</u>, in which he agreed that "the admission of any medical examiner's report prepared by OCME" would be testimonial, but ultimately concurred in the denial of habeas relief, explaining that "[b]ecause of the unsettled state of the law, I agree that the admission into evidence of the autopsy report prepared by [the OCME] did not constitute plain error." <u>James</u>, 712 F.3d at 108.  Accordingly, on this limited habeas review, this Court is constrained by <u>James</u> to conclude that the Supreme Court's Confrontation Clause precedent as to autopsy reports is unsettled, and therefore insufficiently "established" to grant relief to Garlick here.  <u>See</u> <u>id.</u>; <u>Soler v. United States</u>, No. 15 Civ. 4342 (LAP), 2015 WL 4879170 (S.D.N.Y. Aug. 14, 2015) (finding the law in 2007 to be unsettled and discussing that the subsequent case law has not developed a clear set of rules on this point); <u>see</u> <u>also</u> <u>Hensley v. Roden</u>, 755 F.3d 724 (1st Cir. 2014) (finding the state of the law uncertain, undercutting the habeas petitioner's claim that the testimonial nature of autopsy reports was

clearly established); <u>Vega v. Walsh</u>, 669 F.3d 123 (2d Cir. 2012) (finding the state of Supreme

Court Confrontation Clause precedent as of 2005 unclear).

### 4.    Harmless error

Garlick argues that the Autopsy Report "played a critical role in this prosecution" and thus

had a "substantial and injurious effect or influence" on the verdict that does not amount to a

harmless error.  (ECF No. 4 at 33) (citing <u>Brecht</u>, 507 U.S. at 623).  He argues that the Autopsy

Report pinpointed Sherwood's cause and manner of death, prompting the police to drop the

charges against Johanna Rivera, and turn their attention to Garlick as the only suspect.  (<u>Id.</u> at

33–34).  Garlick notes that the Autopsy Report was also used to prove his intent to cause injury,

which was especially important because of his post-arrest statement that he had no intention to

harm Sherwood.  (<u>Id.</u> at 34).  Garlick argues that the Autopsy Report's assertions as to the depth

of the wounds and the blood loss contradicted Garlick's position regarding his intent.  (<u>Id.</u>)

Accordingly, he argues, the admission of these findings was not harmless.  (<u>Id.</u>)

In response, the State contends that its evidence against Garlick was strong.  (ECF No. 12

at 26).  In support of this proposition, the State points to the lobby surveillance footage, Johanna

Rivera's testimony regarding the events leading up to the incident, medical testimony of the EMT

who arrived on the scene, and the fact that Garlick admitted that he had fought Sherwood.  (<u>Id.</u>)

As to Garlick's intent, the State contends that even absent the Autopsy Report, the remaining

evidence offered at trial would have still permitted the jury to find that Garlick "intended to

seriously injure Sherwood."  (<u>Id.</u> at 27).

A Confrontation Clause violation may be harmless unless it "had substantial and injurious

effect or influence in determining the jury's verdict."  <u>Brecht</u>, 507 U.S. at 623 (quoting <u>Kotteakos</u>

v. United States, 328 U.S. 750, 776 (1946)).  When reviewing preclusion of cross examination for harmless error, courts in this Circuit consider:  (1) the strength of the state's case; (2) the importance of the witness's testimony; (3) whether the excluded testimony would have been cumulative; (4) the presence of evidence that would have corroborated the testimony; (5) the extent of the cross examination that was permitted; and (6) whether the cross examination of which the defendant was deprived was of a nature that was likely to affect the result.  McGhee, 2019 WL 4228352, at *9; Alvarez, 763 F.3d at 233.

### a)      Strength of the State's case

The State's case relied heavily on the surveillance video that showed Garlick fighting with Sherwood, and allegedly showed Garlick stabbing Sherwood.  The State contends that "the stabbing . . . was clearly captured on surveillance video." (ECF No. 12 at 26).  But, as Garlick points out, the Trial Court found during the charge conference that, "[t]he video itself presents a jury question whether a knife or sharp object is visible on the film." (ECF No. 13-11 at 20).  There was no other account of the initial encounter between Sherwood and Garlick in the lobby, as Johanna Rivera testified at trial that she was outside of the building when Garlick initially chased Sherwood into the building lobby. (ECF No. 13-1 at 35).  The Autopsy Report, as discussed, concluded that Sherwood had been stabbed. (ECF No. 11-7 at 3).  Had the Autopsy Report not been admitted, the only evidence that would have suggested Garlick had a knife or sharp object would have been the lobby surveillance video, which did not clearly show a knife. (ECF No. 13-11 at 20).  Although Garlick admitted to fighting with Sherwood on the night of his death, without the Autopsy Report, the jury would have had to determine whether Garlick had a sharp object in his hand, whether he intended to harm Sherwood based on only the surveillance video, and whether the stab

wounds caused Sherwood's death.  Accordingly, the Court finds that, absent the Autopsy Report, the State's case is considerably weaker.

### b)   Importance of Dr. Ely's testimony

The Court next considers the importance of Dr. Ely's testimony in the State's case, and finds that her testimony, through which the Autopsy Report was entered into evidence, played a central role in the case.  The State discussed the Autopsy Report twice in its opening statement, called Dr. Ely as its first witness, and introduced the Autopsy Report as its first exhibit.  (ECF No. 13 at 2 ("And he stabbed the victim through the heart, in the left chest, in the right chest, in the back.  You'll get that testimony tomorrow from medical examiner, Dr. El[]y."); 7 ("You'll learn from the autopsy report that the deceased, Gabriel Sherwood, was drunk."); 17 ("We have Dr. Ely here who [will] be the first witness."); 33 ("At this time I would offer into evidence as People's 1 the certified autopsy report on the body of Gabriel Sherwood.")).  The State also relied on the Autopsy Report during summation, recounting the location and depth of Sherwood's wounds and the loss of blood.  (ECF No. 13-12 at 26–27).  The State, during summation, also told the jury that "we know from the medical examiner none [of Johanna Rivera's actions] contributed in any way to the death[.]"  (Id. at 28).  "And remember" the prosecutor said, "the stab that did the killing, the deepest wound went in a distance of up to five and one-half inches.  Five and one-half inches into the body of the victim."  (ECF No. 13-13 at 10).  Thus, Dr. Ely's testimony regarding the Autopsy Report was one of the most important elements of the State's case.

### c)   Cumulative and corroborating evidence

As to the issue of cumulative and corroborating evidence, there was no other medical evidence offered at trial as to the cause or manner of Sherwood's death.  Although the video

showed part of the fight, and what may have been a weapon, and Officer Bagan also testified

that Sherwood was found with stab wounds and could not be revived (ECF No. 4 at 7; ECF No.

13-11 at 20; ECF No. 13-4 at 13), the Autopsy Report was the only evidence that indicated

Sherwood's cause of death was stabbing, as opposed to Johanna Rivera's blows to his head and

body, and was the only evidence that indicated the depth of the wounds, which the State used

to prove intent.  (See supra § III.C.1).  Accordingly, the Court finds that there was little additional

evidence that corroborated the findings in the Autopsy Report, and it was not cumulative of other

evidence offered at trial.

### d)      Extent of cross examination

This Court also considers the extent of cross examination that was permitted and whether

cross examination of Dr. Maloney would have affected the result of the case.  Here, defense

counsel cross examined Dr. Ely, but at the crux of the Confrontation Clause is the premise that

even cross examination of a surrogate witness is insufficient because, not having conducted the

autopsy, she could not testify to any particulars of the procedures apart from what was contained

in the Autopsy Report.  Bullcoming, 564 U.S. at 662.  Of course, had Dr. Maloney been permitted

to testify, these same facts would have been presented at trial, but Dr. Maloney would have had

to answer on cross examination questions regarding her process and qualifications.  Id. at 661

(surrogate testimony "could not convey what [the analyst conducing the test] knew or observed

about the events his certification concerned, i.e., the particular test and testing process he

employed.").

Taken together, these factors indicate that the Trial Court's introduction of the Autopsy

Report may not have been harmless error.  Because, however, the Court finds that the Supreme

Court's Confrontation Clause precedent regarding autopsy reports remains unsettled under the habeas review standard, the Court does not conclusively determine whether the introduction of the Autopsy Report through surrogate testimony constituted harmless error.

## IV.    CONCLUSION

For the foregoing reasons, the Court respectfully recommends that Garlick's petition be DENIED.   Because, however, Garlick has made a substantial showing of the denial of a constitutional right, the Court also recommends that, if the District Court adopts this Report and Recommendation and denies the Petition, a certificate of appealability issue on the questions (1) whether the Supreme Court's Confrontation Clause precedent clearly established that an autopsy report was testimonial and, (2) if so, whether the First Department's decision denying Garlick's Confrontation Clause claim was contrary to, or involved an unreasonable application of, that precedent.  See 28 U.S.C. § 2253.

Dated:        New York, New York
              April 27, 2020

_Sarah Cave_

SARAH L. CAVE
**United States Magistrate Judge**

\*                    \*                    \*

**NOTICE OF PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION**

The parties shall have fourteen (14) days (including weekends and holidays) from service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure.  See also Fed. R. Civ. P. 6(a), (d) (adding

three additional days when service is made under Fed. R. Civ. P. 5(b)(2)(C), (D) or (F)).  A party

may respond to another party's objections within fourteen (14) days after being served with a

copy.  Fed. R. Civ. P. 72(b)(2).  Such objections, and any response to objections, shall be filed with

the Clerk of the Court.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), (d), 72(b).  Any requests for

an extension of time for filing objections must be addressed to Chief Judge McMahon.

**FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.**  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), (d), 72(b); Thomas v. Arn, 474 U.S. 140 (1985).